# UNITED STATES DISTRICT COURT
# IN THE NORTHERN DISTRICT OF CALIFORNIA

*SK*

## CV 19    4591

CIVIL ACTION NO:_____

Robert Zimmerman
329 Sandpiper Lane
Hampstead, NC  28443
Tel # 910-232-8990
Email: bobimmerman@usa.com

FILED

AUG -7 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

| | |
|---|---|
| Robert Zimmerman, and ) | |
| Uxor Press ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | COMPLAINT |
| ) | |
| ) | |
| Facebook, Inc., ) | WITH JURY TRIAL DEMAND |
| Mark Zuckerberg, ) | |
| Sheryl Sandberg, ) | |
| John and Jane Does ) | |
| ) | |
| Defendants. ) | |

1

**TABLE OF CONTENTS**                                            **Page**

I.      Jurisdiction and Venue……………………………………………………4

II.     The Parties……………………..………………………………………..............7

III.    Introduction to and Summary of the Unlawful, Willful and Reckless
        Misconduct of Facebook Defendants…………………………………………..9

IV.     An Unregulated Facebook Threatens Everyone………………………………..17

V.      Representative Foreign and Domestic Governmental Investigations
        into Facebook's Use and Abuse of the Information Facebook has
        Collected from Its Users and Non-Users……………………………………….33

VI.     Facebook Defendants Conspiratorial Conduct and Admissions Regarding
        their Role in the Sabotage of the 2016 U.S. Presidential Election Cycle………..42

VII.    The Many Serious Dangers Inherent in Facebook's Unregulated and
        Unaccountable, Monopolistic Business Model……………………………….80

VIII.   Facebook's Use of Its Users' Information as an Extremely  Valuable Asset
        When  Negotiating Deals with Third Parties to Gain Unfettered Access
        to It…………………………………………………………………………….88

IX.     Russian "Active Measures" Deployed to Sabotage the
        2016 U.S. Presidential Elections Using the Facebook  Platform
        as Set Out in the Special Counsel's Redacted Report…………………………102

X.      Causes of Action……………………………………………………………….110

        Count One- Violation of the Computer Fraud and Abuse Act…………………110

        Count Two- Unjust Enrichment………………………………………………112

        Count Three-Violation of Constitutional Rights………………………..………113

        Count Four- Breach of the Implied Covenant of Good Faith
        and Fair Dealing………………………………………………………………123

        Count Five-Invasion of Privacy – Public Disclosure of Private Facts………….125

2

Count Six-Civil Conversion………………………………………………128

Count Seven-Negligence and Gross Negligence………………………130

Count Eight-Negligent and/or Fraudulent Misrepresentation………………134

Count Nine-Breach of Contract………………………………………136

Count Ten-Willful Infliction of Emotional Distress……………………138

Count Eleven-Common Law Civil Conspiracy……………………………139

Count Twelve-Deceit by Concealment………………………………142

Count Thirteen-Fraud………………………………………………150

Count Fourteen- Willful Misrepresentation……………………………151

Count Fifteen-Civil RICO Conspiracy…………………………………153

Count Sixteen-Violation of the Stored Communications Act………………156

Count Seventeen-Violation of California's Computer Data & Fraud Act………160

Count Eighteen-Violations of California's Unfair Competition Law…………161

XI.    Prayer for Relief…………………………………………………166

XII.   Demand for Jury Trial……………………………………………167

Complaint                                                      Case #

## I.   JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d), as the amount in controversy exceeds $75,000.00 and supplemental jurisdiction pursuant to 28 U.S.C. §1367.

2. This Court also has diversity jurisdiction pursuant to 28 U.S.C. §§ 1331 1332 because Plaintiffs reside in North Carolina, and Facebook Defendants (hereafter "FB" or "FB Defendants ") reside and/or do business in California and North Carolina.

3. This action is also brought pursuant to the U.S. Constitution, as authorized by Article III, section 2, which extends federal judicial power to all cases arising in equity under the U.S. Constitution.

4. This grant of equitable jurisdiction requires Article III courts to apply the underlying principles of the U.S. Constitution to new circumstances unforeseeable by the Framers off the Constitution.

5. An actual controversy has arisen and exists between Plaintiffs and FB Defendants because FB Defendants have placed Plaintiff Zimmerman in a dangerous situation and continue to infringe upon Zimmerman's constitutional rights and have abrogated their duty of care to ensure Zimmerman's reasonable safety, among other violations of federal and state law.

6. The U.S. Constitution recognizes and preserves the fundamental right of citizens to be free from such actions that harm life, liberty, and property, including our nation's election systems, privacy and free speech (especially political speech), which are critical to

4

Zimmerman's rights to life, liberty, and property and which have been, and continue to be, harmed by FB Defendants

7. The above named inherent and inalienable rights reflect the bedrock societal guaranty inherent in the U.S. Constitution, which is to protect citizens and posterity from unconstitutional infringement upon basic freedoms and human and natural rights.

8. The rights to life, liberty, and property have evolved and continue to evolve as technological advances, as here, pose new challenges to these fundamental rights and as new insights reveal discord between the Constitution's central protections and the conduct of government and private parties.

9. This case is likely one of the first filed in this Court that addresses the relationship between the First Amendment and the Internet-based FB communications platform.

10. A fundamental principle of the First Amendment is that all persons have unfettered access to places where they can speak and listen, and then, after reflection, speak and listen once more. A basic rule is that a street or a park is a quintessential forum for the exercise of First Amendment rights. See *Ward v. Rock Against Racism,* 491 U. S. 781, 796 (1989).

11. FB often brags that it offers its users a free facility for communications of all kinds. See *Reno v. American Civil Liberties Union,* 521 U. S. 844, 868 (1997).

12. Among many other promises, FB maintains that its users can debate religion and politics.

13. All fifty states, thousands of cities and towns, and almost every elected U.S.official have FB accounts.

5

14. Also, federal courts always have the authority to determine whether they have the jurisdiction to hear a particular case. *United States v. Ruiz*, 536 U.S. 622, 628 (2002) (citing *United States v. Mine Workers of Am,* 330 U.S. 258,291 (1947). This Court also has original jurisdiction over this action pursuant to 28 U.S.C. §1331 as this action involves allegations of violations of the U.S. Constitution.

15. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because the FB Defendants are subject to personal jurisdiction in this judicial district because they reside and/or do business in this district.

16. Venue is also proper in this District pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the conduct and events giving rise to Plaintiff's claims occurred in this District.

17. Venue is also proper because a substantial part of the conduct giving rise to Plaintiff's claims occurred in or emanated from this District and the relevant terms of Plaintiff's contracts with FB provide that the exclusive venues for litigating any claim with FB are either the United States District Court for the Northern District of California or a state court located in San Mateo County. These non-negotiable, FB adhesion contracts also provided that all claims that might arise between the user and FB would be governed by the laws of California, without regard to conflict-of-law provisions.

18. The FB venue provision provides an additional reason that venue is proper in this District. That choice-of-law provision establishes that California law applies to Plaintiff's claims.

6

19. Moreover, with regard to the choice of law, FB's "Terms of Service" (formerly known as the "Statement of Rights and Responsibilities") contain (and have always contained) a forum selection provision that mandates the resolution of any claim, arising either out of the "Terms of Service" or a person's use of FB, exclusively in the U.S. District Court for the Northern District of California and provides that FB users submit to the personal jurisdiction of those courts to litigate those claims.

20. In addition, the FB "Terms of Service" contain (and have contained since at least April 26, 2011) a California choice-of-law provision, which provides that California law applies to "any claim that might arise between" a user and FB.

21. Plaintiffs could not have brought forth the entirety of their claims until whistleblower Christopher Wylie testified to the U.K. Parliament in 2018 that on or about July 2014 FB's engineers assisted Cambridge Analytica with its plundering of the personal information of nearly a hundred million FB users.

## II.    THE PARTIES

22. Plaintiffs repeat and re-allege all preceding and following paragraphs as if fully set forth herein.

23. Plaintiff, Robert Zimmerman ("Zimmerman"), is nearly 79 years old, a registered voting voter and veteran who resides in Hampstead, North Carolina.

7

24. He has written three political books that set out progressive agendas for the U.S.: *Metacapitalism* (1985), the *American Challenge* (2005) and *Common Sense* (2016) available online free of charge.

25. Zimmerman was also a grassroots Democratic candidate for the U.S. Senate, finishing second of eight candidates in a Democratic primary, losing to a multi-term, favorite son incumbent.

26. While campaigning, Zimmerman was arrested for trespassing in a downtown public park and at a state fair for distributing copies of the U.S. Constitution and his campaign brochure to prospective voters and was found not guilty.

27. Plaintiff Uxor Press is a small unincorporated publishing business, 100% owned by Zimmerman. Uxor Press published the books listed above and a few others.

28. Zimmerman's political activities and books demonstrate that he has been deeply involved in U.S. politics for over three decades and has been severely damaged directly and indirectly by the anti-democratic conspiratorial and non-conspiratorial actions and inactions of FB Defendants.

29. FB, Inc. is incorporated in the State of Delaware. It has principal offices at 1601 Willow Road and at 1 Hacker Way, both in Menlo Park, California 94025.

30. FB Defendant Mark Zuckerberg (hereafter "Zuckerberg" or "Mark Zuckerberg" or "FB Defendants" or "FB"). He is FB's co-founder and Chief Executive Officer at all relevant times.

8

31. FB Defendant Sheryl Sandberg (hereafter "Sandberg" or "Sheryl Sandberg" or "FB Defendants" or "FB" is FB's Chief Operating Officer ("COO").

32. Named and unnamed unserved John and Jane Does.

## III.   INTRODUCTION TO AND SUMMARY OF THE , WILLFUL AND RECKLESS MISCONDUCT OF FB DEFENDANTS

33. Plaintiffs incorporate by reference all paragraphs contained throughout this Complaint as if fully set forth herein.

34. FB, Inc. (hereafter "FB") is arguably the world's most powerful corporation, with a global audience of some 2.2 billion people, who use its platform to message with each other, for local, nation and international news and many other purposes.

35. FB Defendants, (hereafter referred to collectively as FB or Facebook, have used and continue to use the FB platform and their immense wealth to transform the world, particularly the U.S. in ways that only the FB can control, including the successful sabotage of the 2016 presidential election cycle and the prospective introduction of FB's own international currency under the aegis of Swiss law.

36. Hundreds of millions of FB users obtain most of their news by from the FB platform and that news is selected by FB without any recompense by FB to the legitimate global press.

37. FB does not any of deploy standard journalistic fact checking safeguards to avoid fake news and other forms of misleading propaganda such as that deployed by Russian operatives, the Trump Campaign, Cambridge Analytica, Robert Mercer and others during, and now after, the 2016 U.S. presidential election cycle.

9

38. FB violated Plaintiff Zimmerman's First Amendment rights by first granting him and his publishing company unfettered access to the FB platform and then unlawfully revoking that access causing Plaintiffs severe economic harm and other injuries.

39. After revoking Plaintiffs access, FB has admitted that they granted unfettered access to FB user information, such as Plaintiffs' had supplied to FB in order to gin unfettered access to the FB platform, to numerous third parties without Plaintiff's knowledge or consent and in doing so, FB caused billions of FB users' privacy to be invaded and inflicted severe economic harm and other injuries on them.

40. In 2018, investigative journalists discovered that a British political consulting and information mining firm called Cambridge Analytica unlawfully obtained the FB user' information of many millions of FB users, possibly including that of the Plaintiffs, and used it in various ways together with others to successfully sabotage the 2016 U.S. and the 2020 presidential election cycles in favor of candidate Donald J. Trump, who later became a subject of a Department of Justice ("DOJ") appointed Special Counsel's investigation into that sabotage.

41. Cambridge Analytica's unlawful misappropriation and unlawful use of FB user information was one of many plunders and unlawful uses of FB user' information.

42. Since approximately 2008, without the knowledge or permission of their users, FB encouraged and allowed numerous third-parties to download FB user' information; other plunderers were not FB authorized.

43. FB also traded or sold unfettered access to Plaintiff's users' information to numerous individuals, businesses and governmental agencies,

44. These investigative reporter revelations have shown that FB is far more than a supplier purportedly free access to an Internet-based communications platform. FB is also one of the world's largest sellers of advertising space, an information brokerage and surveillance firm and derives billions in annual profits from these activities.

45. FB, having recognized that its users' public and private information is incredibly valuable, set about collecting, storing and supplementing and aggregating that information and then selling and trading unfettered access to that information to it to its business partners and numerous other third parties.

46. If FB had proceeded lawfully, instead of unlawfully as it did, as a seller of advertising space and an information brokerage and surveillance firm, it would have, at a minimum, obtained the consent of it users to sell and trade, aggregate and supplement its users' information, but FB never did.

47. It's likely that the vast majority of FB's billions of users are not aware of how FB is exploiting their information and the dangers and other problems that they may encounter as a result of FB's exploitive activities.

48. FB's deceptive, willful, reckless and unlawful conduct violated the contractual promises and public pronouncements that it would protect the privacy of its users' information and was recently fined $ five billion by the Federal Trade Commission ("FTC") for such user privacy violations.

11

49. To encourage prospective users/communicators to join and engage with each other on its Internet-based communication platform, FB misled prospective users into believing that they controlled their FB user' information through certain privacy settings and other FB tools.

50. But, contrary to FB's express promises, these privacy settings and other tools did not prevent access by numerous third-parties.

51. FB also manipulated FB users' default privacy settings. In April 2010, FB unilaterally changed users' default "Profile Privacy Settings" so that the default settings indiscriminately shared FB user' information with third parties. This change sparked the concerns of privacy advocates and ultimately the FTC.

52. Reasonably believing in FB's user information privacy promises , Plaintiffs shared their FB user' information and messages with their FB "Friends." FB "Friends" are persons and entities that are FB users that have agreed to communicate with Plaintiffs on the FB platform.

53. The comprehensiveness of the FB user' information, unavailable to traditional sellers of advertising space, is what makes it so valuable to advertisers and others who wish to personally target FB users with their messages and gives FB a substantial competitive edge over them.

54. It is the atypical way that FB collects, analyzes and deploys FB user' information that inflicts a novel and more invasive kind of harm than typical information breaches.

Complaint                                                                          Case #

55. FB's aggregation of its users' information allows third parties and FB to make that FB user' information public and/or share it with third parties and connect it to specific users, by name, contrary to FB's explicit pledge not to sell FB user' information to advertisers or share it with third parties.

56. The fundamental segments of a FB users' information profile are pictures, phone numbers, email addresses and the kind of corroborating personal information used for passwords and security questions are essential ingredients for identity theft and other malicious online activity.

57. Information access and processing experts agree that this aggregated information makes people much more vulnerable to voter fraud, medical fraud, phishing, and other identity-based harms.

58. The harm is not limited to identity theft. The ability to analyze and deanonymize FB user' information allows third parties to personally and psychologically target FB users with greater precision, a technique now called psychographic marketing.

59. For example, Cambridge Analytica exploited FB users' information to target individual voters with content tailored to their predicted psychological proclivities.

60. FB and other information brokers compile dossiers on FB users based on this aggregated content. The dossiers make assumptions about users' health, financial risk, employability and other factors

61. Information brokers like FB then make that information accessible to third parties, including advertisers, hackers and political subversives to target people based on analyses of their temperament and vulnerabilities.

62. FB has repeatedly professed remorse for willfully violating its users' privacy.

63. Following entry of the 2012 FTC "Consent Decree," Zuckerberg stated, "…we've made a bunch of mistakes [intentional conduct that produced many billions in profit for FB]."

64. Zuckerberg then assured FB users that FB was committed to providing its users with "complete control over who they share with at all times." See Zuckerberg's pledge at, *Our Commitment to the Facebook Community*, FB Newsroom (Nov.29, 2011), https://newsroom.fb.com/news/2011/11/our-commitment-to-the-facebookcommunity/.

65. Zuckerberg added, "This means we're making a clear and formal long term commitment to do the things we've always tried to do and planned to keep doing, giving you [FB users] tools to control who can see your information and then making sure only those people you intend can see it."

66. Since the Cambridge Analytica FB user' information plundering scandal was exposed, Zuckerberg has continued apologizing for FB's unlawful activities, usually calling that willful and for profit unlawful activity a "mistake" but never offering FB users any redress for FB's unlawful conduct.

67. For example, on April 18, 2018, Zuckerberg admitted, "We didn't focus enough on preventing abuse and thinking through how people could use these tools to do harm as well. That goes for fake news, foreign interference in elections, hate speech, in addition

14

to developers and information privacy. We didn't take a broad enough view of what our responsibility is, and that was a huge mistake. It was my mistake."

68. The time for pro forma apologies by FB Defendants has long since passed.

69. Now, only judicial process, such as this and numerous other lawsuits, can redress those injured by FB's malicious and reckless unlawful conduct.

70. Zimmerman and his solely-owned publishing business Uxor Press bring this action seeking recovery for injuries suffered as a result of the willful, unconstitutional, conspiratorial, reckless, outrageous, unlawful and possibly treasonous conduct of FB and also seeks injunctive relief that to forestall and deter FB and others from such unlawful and improper conduct in the future.

71. On March 8, 2019, Senator and presidential candidate Elizabeth Warren proposed breaking up FB as has FB's co-founder Chris Hughs as well as numerous civil lawsuits foreign and domestic governmental investigations involving FB's alleged monopolistic and other unlawful conduct, including FB's information-sharing-agreements with third parties and participation in the sabotage of the U.S. 2016 presidential elections.

72. Only a few days after Senator Warren unveiled her FB breakup proposal, FB pulled her political ads from its  platform, to a far lesser degree, the very same sort of malicious, First Amendment defying censorship FB Defendants deployed against Plaintiffs.

73. In ever-increasing numbers, consumers, lawmakers, regulatory agencies domestic and foreign, investors and private citizens the world over are increasingly concerned about FB's unlawful use of its monopoly power.

15

74. Complaints against FB include FB's failure to safeguard FB user' information, FB's failure to protect its users from, among other things, hate speech, terrorist propaganda and recruitment activity, child abuse, Russian political propaganda, U.S. election sabotage, all sorts of disinformation and live footage of violent acts.

75. FB has agreed to hand over the identification information of French FB users suspected of hate speech on its platform to French judges but has entirely ignored a 2012 "Consent Decree" it signed with the FTC. More on the "Consent Decree" below.

76. Among other serious unlawful activities, FB willfully breached FB's contracts and promises with Plaintiffs by permitting third parties like Cambridge Analytica, Russian intelligence agents and operatives, Robert Mercer and the Trump Campaign to willfully exploit FB's lax to non-existent user privacy protections.

77. Contrary to FB's purported mission to connect the entire world, FB blocked Plaintiffs business and personal accounts and by so doing violated Zimmerman's First Amendment right to publish his non-violent, pro-democracy, political views on FB's platform and market his political and non-political books on FB's platform, and in so doing knowingly, recklessly and unlawfully violated Zimmerman's free speech rights and his constitutionally-protected right to participate in free and fair elections as well as his Fourth Amendment privacy rights by willfully allowing third-parties to access his FB user information without seeking Plaintiff's authorization and without his knowledge.

78. As late as July 2019, a FB executive in charge of global information testifying before Congress could not or would not answer a congressman's question regarding why Al Qaeda

16

is still allowed to recruit terrorists using the FB platform.

79. The constitutional violations, conspiratorial and other tortious and criminal conduct of FB includes:

- Direct and indirect participation in a racketeering enterprise. See Count Fifteen.

- Willful, promised and repeated failure to protect and not make available to third parties Plaintiff's user' information that Plaintiffs had entrusted to it;

- Blocking Plaintiff's access and use of his personal and business accounts;

- Active participation in the sabotage of the 2016 U.S. presidential elections by facilitating the Trump Campaign's use of Plaintiff's plundered FB user' information and communications to sabotage of the 2016 U.S. presidential elections, primary and general.

- Failure to block Cambridge Analytica from the theft and use Plaintiffs' FB user' information and that of nearly a hundred million other FB users' information to help sabotage the 2016 U.S. presidential elections.

## IV.   AN UNREGULATED FB THEATENS EVERYONE

80. Plaintiffs repeat and re-allege all preceding and following paragraphs throughout this Complaint as if fully set forth herein.

81. FB and one man, FB's CEO Mark Zuckerberg, and one woman, FB's COO Sheryl Sandberg, without any effective checks on their conduct, have amassed monopolistic power and have used that power in a intentionally deceptive, reckless and unlawful manner that endangers and negatively impacts the quality of the life and constitutional rights of

17

Plaintiffs and billions of other FB users and non-users, going so far as to recently propose the creation of its own international currency that would be based in Switzerland and could likely threaten the stability of the global financial system and markets and the U.S. governments., as well as many others.  More on FB's proposed currency below.

82. FB Defendants have played the principle role in accelerating the transformation of America and other nations from the age of information to the age of disinformation, a transformation that tears at the very fabric of the democratic ideals envisioned by America's Founders.

83. Other businesses like *Fox News* are also culpable, but none of them has anything like the global reach (billions of FB users), financial and technological resources, unregulated monopolistic power, and seemingly boundless ambition to trample on our rights to free speech, free and fair elections and our right to privacy as does FB.

84. FB has devised rules of the road that benefit only FB at the expense of its users' privacy and safety, always surveilling its users and treating them in whatever way FB deems most advantageous to FB unrestrained by any ethical norms and only a few, and mostly ineffective government imposed rules and regulations.

85. The former head of FB's information science team described FB's user tracking and surveillance to a microscope that allows FB to examine its users' social behavior with a degree of intensity never previously available and to run undetected experiments on its billions of users without regard to their privacy and safety and for no social purpose whatsoever other than advancing FB's monopolistic and political power.

18

86. Another member of the information science team said "Anyone on [that] team could run a test. They're always trying to alter people's behavior."

87. As FB gains greater and greater monopolistic market reach and financial and political power by, among other things, tracking its user's activities and shaping the news its users' see, the threat to our democracy grows ever greater as occurred when FB willfully participated with Russian operatives, the Trump Campaign, Robert Mercer, Cambridge Analytica and others in the sabotage of the primary and general 2016 U.S. presidential elections.

88. Shortly after FB offered a small portion of its stock to the public, FB amassed over a billion dollars in profit and paid no income tax, actually receiving an approximately $400 million tax deduction and/or refund by writing off the value of the stock options it conferred on certain of its executives.

89. In 2018, FB spent over $22 million to protect Zuckerberg from harm and hardly a pittance, if anything, to protect Plaintiffs and billions of other FB users and non-users that it was willfully placing in danger.

90. The many dangers, past, present and future FB has inflicted, and will continue to inflict, on its users and non-users are many. Even so, FB has effectively established itself in the everyday life of millions of Americans, which provides all the more reason for this Court to act to thwart the very real dangers and other perils that FB users and non-users face from an unregulated FB.

91. In sum, among many perilous and otherwise damaging activities the virtually an unregulated FB routinely aids and abets includes:

- Election rigging;

- Terrorist activity;

- Organized immigration crime.

- Slavery trafficking.

- Extreme and revenge pornography;

- Incitement of violence, hate crime, harassment, intimidation, bullying, trolling and Cyberstalking;

- Sale of illegal goods and services, such as drugs and assault weapons;

- Content unlawfully uploaded to and from prisons;

- Sexting and distributing indecent or sexual images of children under the age of 18;

- Children accessing pornography and other inappropriate material, including children under 13 using dating applications;

- Child sexual exploitation and abuse by pedophiles;

- Distribution of enemy and adversary propaganda and disinformation;

- Advocacy of self-harm, female genital mutilation and suicide.

92. As late as July 2019, FB, Twitter, Google and other platforms say they are actively collaborating to fix the above-listed problems.

93. These multibillion dollar corporations claim they have formed a group through which they are actively collaborating to remedy the above-listed problems, which is nothing but an

20

egregious deception as the so-called group has no budget, no assigned full time employees and no physical meeting place, no discrete short or long term measurable or even non-measurable specific objectives and no established timeframe for accomplishing anything.

94. The U.S. government, much like it did when it failed to assert the dangers of smoking, has entirely failed to take the actions necessary to protect Americans from an unregulated FB.

95. Most Americans are unaware of the very real dangers an unregulated FB poses, though some Americans were successfully recruited by Al Qaeda's use of the FB platform. See, *Zucked: Waking Up to the FB Catastrophe,* (2019), by Roger McNamee, a large FB shareholder.

96. An unregulated FB, among other nefarious activities, is used to spread hate speech, to abuse and bully and to undermine our democratic values and limit legitimate debate.

97. The impact of unregulated and harmful FB messaging is particularly damaging for children and that activity is widespread on FB.

98. In 2018 there were over 18.4 million referrals of child sexual abuse material to the National Center for Missing and Exploited Children.

99. Child sex offenders use FB to view and share child sexual abuse material, recruit children for sexual abuse and broadcast images of the sexual abuse of children.

100.     The prevalence of anti-democratic propaganda messaging on FB threatens our national security and thus the physical safety of every American and is obviously unacceptable.

21

101.    FB is used by terrorists to recruit vulnerable people with propaganda designed to radicalize and incite violence against the U.S. and elsewhere.

102.    Terrorist groups also use FB to broadcast live terrorist attacks.

103.    Dangerous opioids are marketed and sold on FB.

104.    Hostile actors increasingly use FB to spread disinformation to undermine our democratic values the rule of law.

105.    FB uses sophisticated algorithms that send FB users to 'echo chambers or 'filter bubbles, where FB users are presented with disinformation instead of seeing a range of voices and opinions. This ensures that FB users do not see messaging that runs contrary to the disinformation FB helps broadcast for Russia and other U.S. adversaries.

106.    Criminal gangs use FB to promote gang culture and incite violence. This, together with  the illegal sale of weapons to young people online, is a contributing factor in the dramatic rise of lethal gang violence on America's streets.

107.    FB is used to harass, bully or intimidate people in vulnerable groups or in public life. The President prefers Twitter and *Fox News.*

108.    FB increasingly exposes young adults and children to all sorts of harmful content that serves to induce violent behavior, self-loathing and harm and suicide.

109.    FB has worked strategically to maintain its monopolistic policies and practices, which include willful and numerous violations of constitutional and antitrust law.

22

110.     Columbia Law School professor Tim Wu observes in his book *The Curse of Bigness* has said: "To think of monopolies and oligopolies as worrisome only if they charge high prices is a narrow perspective."

111.     In practice, monopolistic product pricing is only one form of harm that giant corporations like FB often inflict.

112.     FB's market dominance and technical knowhow allows FB to behave in dangerous ways.

113.     Without seeking permission from its users, FB  collects and uses for its own purposes the public and private FB user' and non-user' personal information of billions of people, and businesses and governments, including Plaintiffs.

114.     FB then uses that information in various ways to increase its advertising and other revenue intake and profitability, including selling targeted advertising, selling targeted product and life-style research and selling FB user information and its technological expertise to aid and abet the rigging of political elections.

115.     FB has an extensive history of failures to protect it user's privacy.

116.     For example, in 2007 FB implemented an information tracking computer program called Beacon, which lifted information about FB user's purchases and activities from other platforms and websites and then posted that information to FB's "NewsFeed" without obtaining FB user' approval.

117.     Weeks after Beacon's introduction, FB users responded by signing a petition demanding that FB stop its Beacon activities, citing concerns over privacy.

23

118.     In response, FB created an "opt-out" from the service. Zuckerberg commented, "[w]e simply did a bad job with this release, and I apologize…" (one of numerous FB Defendants' admissions against interest.)

119.     Nineteen FB users, unsatisfied with FB's response to their complaints, sued FB for violations of various state and federal privacy statutes, and sought damages and a variety of equitable remedies. FB settled certain of these lawsuits for $9.5 million.

120.     The terms of the settlement included FB agreeing to terminate its use of Beacon and funding a new charity organization called the Digital Trust Foundation whose mission was to "fund and sponsor programs designed to educate users, regulators and enterprises on critical issues relating to protection of identity and information online through user control, and the protection of users from online threats."

121.     Despite agreeing to terminate its use of Beacon, FB's counsel stated that nothing in the settlement agreement precluded FB from reinstituting FB's use of Beacon after changing its name.

122.     In 2008, FB introduced Open ID, an application that gave FB users a means to log on to other websites with their FB credentials.

123.     FB also made its "Like" button available on other websites, further blurring the lines of privacy and allowing for widespread tracking of a person's web browsing history, even for non-FB users.

24

124.     One year after FB's launch of Open ID, FB changed its default settings to make its user's profiles public by default. FB users objected. Even so, but it took FB five years to restore the previous default settings.

125.     In December 2009, without warning or obtaining their users' approval, FB changed its platform so that certain information that its users had designated as private was made readily available to third parties.

126.     FB represented that third party applications installed by FB users would have access only to FB user' information needed to operate, when, in fact, the third party applications and their developers could access most FB user's information.

127.     FB also told FB users they could restrict the sharing of their FB user' information to FB "Friends Only." However, selecting "Friends Only" did not prevent FB user's information from being accessed by third parties. See, *Lane v. FB Inc.,* 696 F.3d 811 (9th Cir. 2012). See also *Transcript of Fairness Hearing* dated February 26, 2010 and *Lane v. FB, Inc.,* Civ. No. C 08-3845 (ND Cal.) After FB users protested, Zuckerberg apologized for what he called his "mistake" and promised to do better.

128.     Had the CEO of any other large corporation made what Zuckerberg deemed his "mistake," his board and shareholders would have fired that person. But Zuckerberg, who owns the controlling voting shares in FB, is uncontrollable by FB shareholders or, so it seems by any governmental regulatory agency, the FTC excepted, or the DOJ.

129.     As long as FB had rivals, the fear of losing its users somewhat restrained FB's behavior.

25

Complaint                                                                                  Case #

130.    But as FB's growth has surged, FB, following in the footsteps of other current and

previous monopolies, has stepped up its purchase of competitors, and with competitive

pressure no longer a FB concern, FB has deceptively, recklessly and willfully ignored the

privacy promises they had contracted with its users to uphold because now FB users have

no viable alternative to FB.

131.    In ever more deceptive ways,  FB continues to violate its non-negotiable privacy

and policy practices.

132.    FB developed plugin algorithms called "Like"  and "Share" buttons that it licenses

to website owners. The licenses require third party website owners to install the plugin

algorithms on their websites, which opens a pathway of communication between FB user's

devices and FB's user' information repositories.

133.    FB had promised it would not use this licensing pathway to conduct commercial

surveillance and later reneged on that promise.

134.    Having taken the  FB licensing pathway promise as gospel, CNN, the *New York

Times,* the *Wall Street Journal*, *Slate* and ABC were among the first companies to sign up

for the plugins.

135.    However, in June 2014, FB publicly reversed course by announcing it would use

its licensing algorithm plugins as installed on third party websites to surveil consumer

behavior.

136.    By then, FB's licensing algorithm was installed on millions of websites and mobile

applications and rapidly spread like an undetected, highly infectious, plague.

137.     These days, all a person has to do is visit a page with a "Like" button, and FB, without authorization, collects, stores and aggregates your public and private information, such as what you're buying or what you're reading or where you're traveling.

138.     FB's monopolistic conduct negatively impacts billions of people and businesses, including Plaintiff's.

139.     FB uses its market dominance and unlawfully obtained information resources to undercut their competitors in the advertising market because its purloined consumer information allows it to target FB users' preferences and behavior than other sellers of advertising can.

140.     For example, the *New York Times* may know which of its online readers have clicked on its health-related content. But FB knows which *Times* health-content readers vacation in Florida, shop for Nike shoes and read workout blogs because its widespread coding gives it the capability to track people all over the Internet and connect that online activity to their FB user' information repositories.

141.     Thus, the *Times* cannot effectively compete with FB's illicitly gained edge in the advertising market. Moreover, the *Times* pays most its content producers, while FB merely steals the information that it needs.

142.     This is one big reason why newspapers and other online publishers are experiencing financial difficulty. While FB continues racking up record profits, it poses an ever-increasing threat to our fragile democracy, to fair competition, to privacy and free speech, to the rule of law and to free and fair elections.

27

Complaint                                                                                   Case #

143.    One powerful remedy to FB's monopolistic policies and practices is the U.S. Sherman Antitrust Act of 1890, written at the height of the Gilded Age to confront the out-of-control growth of concentrated power in business and the anti-competitive conduct of monopolies.

144.    FB is in violation of the Sherman Antitrust Act because it has harmed countless millions of people and businesses by deploying monopolistic business practices and policies to restrict competition and relentlessly continues to expand its monopoly market power with its willfully reckless, deceptive and unlawful conduct.

145.    In the wake of increasingly expressed public anger, Zuckerberg announced a new privacy vision for FB, a willfully deceptive, self-serving vision that entirely fails to address any of FB's monopolistic policies and practices.

146.    Calls for holding FB accountable for its unlawful conduct include Senator Elizabeth Warren and the *New York Time's* Kevin Roose, who favor breaking up FB.

147.    Senator Warren also called for reclassifying FB as a public utility.

148.    Meanwhile, much like the monopolists of the Gilded Age, Zuckerberg insists that FB is only interested in the progress of civilization, in his words "bringing the world closer together."

149.    Unfortunately, what unaccountable monopolies typically do is tear the world apart, not closer together as its election rigging and broadcast of hate speech shows.

150.    Throughout history, unregulated and unaccountable monopolies like FB have produced economic inequality, stifled innovation and created widespread public anger, a

condition that has enabled anti-democratic authoritarian governments, a condition remarkably similar to those now tearing at the roots of America's already fragile democracy.

151.     Fortunately, the last Gilded Age taught us something about how to control monopolists.

152.     It won't happen under President Trump and the Republican-dominated Congress, but certain of the President's 2020 challengers are making breaking up monopolies like FB a central part of their appeal to voters and before that our judiciary and regulatory agencies may take appropriate action.

153.     Historically, the American electorate voted for trustbusting, anti-monopolists like Theodore Roosevelt who promised to and did enforce the Sherman Antitrust Act.

154.     In 2018, the FTC announced a prospective large fine against FB, large but only chump change in view of FB's vast financial resources and its willful violations of the 2012 "Consent Decree" FB signed with the FTC but has not honored. Following are the 2012 FTC Orders FB has ignored:

**Part I. IT IS ORDERED** that Respondent and its representatives, in connection with any product or service, in or affecting commerce, shall not misrepresent in any manner, expressly or by implication, the extent to which it maintains the privacy or security of covered information, including, but not limited to:
A. its collection or disclosure of any covered information;
B. the extent to which a consumer can control the privacy of any covered information maintained by Respondent and the steps a consumer must take to implement such controls;
C. the extent to which Respondent makes or has made covered information accessible to third parties;
D. the steps Respondent takes or has taken to verify the privacy or security protections that any third party provides;

29

E. the extent to which Respondent makes or has made covered information accessible to any third party following deletion or termination of a user's account with Respondent or during such time as a user's account is deactivated or suspended; and

F. the extent to which Respondent is a member of, adheres to, complies with, is certified by, is endorsed by, or otherwise participates in any privacy, security, or any other compliance program sponsored by the government or any third party, including, but not limited to, the U.S.-EU Safe Harbor Framework.

**Part II. IT IS FURTHER ORDERED** that Respondent and its representatives, in connection with any product or service, in or affecting commerce, prior to any sharing of a user's nonpublic user information by Respondent with any third party, which materially exceeds the restrictions imposed by a user's privacy setting(s), shall:

A. clearly and prominently disclose to the user, separate and apart from any "privacy policy," "data use policy," "statement of rights and responsibilities" page, or other similar document: (1) the categories of nonpublic user information that will be disclosed to such third parties, (2) the identity or specific categories of such third parties, and (3) that such sharing exceeds the restrictions imposed by the privacy setting(s) in effect for the user; and

B. obtain the user's affirmative express consent.

Nothing in Part II will (1) limit the applicability of Part I of this order; or (2) require Respondent to obtain affirmative express consent for sharing of a user's nonpublic user information initiated by another user authorized to access such information, provided that such sharing does not materially exceed the restrictions imposed by a user's privacy setting(s). Respondent may seek modification of this Part pursuant to 15 U.S.C. §45(b) and 16 C.F.R. 2.51(b) to address relevant developments that affect compliance with this Part, including, but not limited to, technological changes and changes in methods of obtaining affirmative express consent.

**Part III. IT IS FURTHER ORDERED** that Respondent and its representatives, in connection with any product or service, in or affecting commerce, shall, no later than sixty (60) days after the date of service of this order, implement procedures reasonably designed to ensure that covered information cannot be accessed by any third party from servers under Respondent's control after a reasonable period of time, not to exceed thirty (30) days, from the time that the user has deleted such information or deleted or terminated his or her account, except as required by law or where necessary to protect the FB website or its users from fraud or illegal activity. Nothing in this paragraph shall be construed to require Respondent to restrict unfettered access to any copy of a user's covered information that has been posted to Respondent's websites or services by a user other than the user who deleted such information or deleted or terminated such account.

**Part IV.  IS FURTHER ORDERED** that Respondent shall, no later than the date of service of this order, establish and implement, and thereafter maintain, a comprehensive privacy program

that is reasonably designed to (1) address privacy risks related to the development and management of new and existing products and services for consumers, and (2) protect the privacy and confidentiality of covered information. Such program, the implementation of which must be documented in writing, shall contain controls and procedures appropriate to Respondent's size and complexity, the nature and scope of Respondent's activities, and the sensitivity of the covered information, including:

A. the designation of an employee or employees to coordinate and be responsible for the privacy program.

B. the identification of reasonably foreseeable, material risks, both internal and external, that could result in Respondent's unauthorized collection, use, or disclosure of covered information and an assessment of the sufficiency of any safeguards in place to control these risks. At a minimum, this privacy risk assessment should include consideration of risks in each area of relevant operation, including, but not limited to: (1) employee training and management, including training on the requirements of this order, and (2) product design, development, and research.

C. the design and implementation of reasonable controls and procedures to address the risks identified through the privacy risk assessment, and regular testing or monitoring of the effectiveness of those controls and procedures.

D. the development and use of reasonable steps to select and retain service providers capable of appropriately protecting the privacy of covered information they receive from Respondent and requiring service providers, by contract, to implement and maintain appropriate privacy protections for such covered information.

E. the evaluation and adjustment of Respondent's privacy program in light of the results of the testing and monitoring required by subpart C, any material changes to Respondent's operations or business arrangements, or any other circumstances that Respondent knows or has reason to know may have a material impact on the effectiveness of its privacy program.

**Part V. IT IS FURTHER ORDERED** that, in connection with its compliance with Part IV of this order, Respondent shall obtain initial and biennial assessments and reports ("Assessments") from a qualified, objective, independent third party professional, who uses procedures and standards generally accepted in the profession. A person qualified to prepare such Assessments shall have a minimum of three (3) years of experience in the field of privacy and data protection. All persons selected to conduct such Assessments and prepare such reports shall be approved by the Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, Washington, D.C. 20580, in his or her sole discretion. Any decision not to approve a person selected to conduct such Assessments shall be accompanied by a writing setting forth in detail the reasons for denying such approval. The reporting period for the Assessments shall cover: (1) the first one hundred and eighty (180) days after service of the order for the initial Assessment, and (2) each two (2) year period thereafter for twenty (20) years after service of the order for the biennial Assessments. Each Assessment shall:

Complaint                                                                                      Case #

A. set forth the specific privacy controls that Respondent has implemented and maintained during the reporting period;

B. explain how such privacy controls are appropriate to Respondent's size and complexity, the nature and scope of Respondent's activities, and the sensitivity of the covered information;

C. explain how the privacy controls that have been implemented meet or exceed the protections required by Part IV of this order; and

D. certify that the privacy controls are operating with sufficient effectiveness to provide reasonable assurance to protect the privacy of covered information and that the controls have so operated throughout the reporting period.

Each Assessment shall be prepared and completed within sixty (60) days after the end of the reporting period to which the Assessment applies. Respondent shall provide the initial Assessment to the Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, Washington, D.C. 20580, within ten (10) days after the Assessment has been prepared. All subsequent biennial Assessments shall be retained by Respondent until the order is terminated and provided to the Associate Director of Enforcement within ten (10) days of request.

**Part VI. IT IS FURTHER ORDERED** that Respondent shall maintain and upon request make available to the Federal Trade Commission for inspection and copying, a print or electronic copy of: A. for a period of three (3) years from the date of preparation or dissemination, whichever is later, all widely disseminated statements by Respondent or its representatives that describe the extent to which Respondent maintains and protects the privacy, security, and confidentiality of any covered information, including, but not limited to, any statement related to a change in any website or service controlled by Respondent that relates to the privacy of such information, along with all materials relied upon in making such statements, and a copy of each materially different privacy setting made available to users;

B. for a period of six (6) months from the date received, all consumer complaints directed at Respondent or forwarded to Respondent by a third party, that relate to the conduct prohibited by this order and any responses to such complaints;

C. for a period of five (5) years from the date received, any documents, prepared by or on behalf of Respondent, that contradict, qualify, or call into question Respondent's compliance with this order;

D. for a period of three (3) years from the date of preparation or dissemination, whichever is later, each materially different document relating to Respondent's attempt to obtain the consent of users referred to in Part II above, along with documents and information sufficient to show each user's consent; and documents sufficient to demonstrate, on an aggregate basis, the number of users for whom each such privacy setting was in effect at any time Respondent has attempted to obtain and/or been required to obtain such consent; and

E. for a period of three (3) years after the date of preparation of each Assessment

32

required under Part V of this order, all materials relied upon to prepare the Assessment, whether prepared by or on behalf of Respondent, including but not limited to all plans, reports, studies, reviews, audits, audit trails, policies, training materials, and assessments, for the compliance period covered by such Assessment.

**Part VII. IT IS FURTHER ORDERED** that Respondent shall deliver a copy of this order to (1 all current and future principals, officers, directors, and managers; (2) all current and future employees, agents, and representatives having supervisory responsibilities relating to the subject matter of this order, and (3) any business entity resulting from any change in structure set forth in Part VIII. Respondent shall deliver this order to such current personnel within thirty (30) days after service of this order, and to such future personnel within thirty (30) days after the person assumes such position or responsibilities. For any business entity resulting from any change in structure set forth in Part VIII, delivery shall be at least ten (10) days prior to the change in structure.

**Part VIII. IT IS FURTHER ORDERED** that Respondent shall notify the Commission within fourteen (14) days of any change in Respondent that may affect compliance obligations arising under this order, including, but not limited to, a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor corporation; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this order; the proposed filing of a bankruptcy petition; or a change in either corporate name or address. Unless otherwise directed by a representative of the Commission, all notices required by this Part shall be sent by overnight courier (not the U.S. Postal Service) to the Associate Director of Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, D.C. 20580, with the subject line *In the Matter of FB, Inc.*, FTC File No.[ ]. *Provided, however*, that in lieu of overnight courier, notices may be sent by first-class mail, but only if an electronic version of any such notice is contemporaneously sent to the Commission at Debrief@ftc.gov.

**Part IX. IT IS FURTHER ORDERED** that Respondent, within ninety (90) days after the date of service of this order, shall file with the Commission a true and accurate report, in writing, setting forth in detail the manner and form of their own compliance with this order. Within ten (10) days of receipt of written notice from a representative of the Commission, Respondent shall submit additional true and accurate written reports.

## V.   REPRESENTATIVE FOREIGN AND DOMESTIC GOVERNMENTAL INVESTIGATIONS INTO FB'S USE AND ABUSE OF THE INFORMATION FB HAS COLLECTED FROM ITS USERS AND NON-USERS

155.      Plaintiffs repeat and re-allege all preceding and following paragraphs throughout

this Complaint as if fully set forth herein.

156.     Upon receiving a number of complaints, the FTC investigated FB's privacy

practices in 2011 which resulted in a consent decree barring FB from making any further

deceptive privacy claims and required FB to obtain approval of the FB user' before it

changed the way FB shared its user's information and required that FB undergo periodic

assessments of its privacy practices by independent, third party auditors for 20 years.

157.     In another of many admissions against interest and in response to the "Consent

Decree" FB signed with the FTC in 2012, Zuckerberg stated, "I'm the first to admit that

we've made a bunch of mistakes . . ."

158.     On March 11, 2011, FB users sued FB for allowing advertisers on its platform

unfettered access to the names, photographs, likenesses and identities of its users so that

they could advertise all sorts of goods and services without the consent of their users.

This lawsuit involved a FB feature called "Sponsored Stories," which essentially turned

FB user's activity into an endorsed advertisement on their "Friends" pages, a feature of

which FB's users were unable to opt-out of.

159.     A $20 million settlement was reached in this matter on May 10, 2012, in which

FB agreed to revise its "Terms of Use" and parental controls, establish a settlement fund

for authorized claimants to receive restitution  and allocate additional funds to various

charities. See FB, Inc., Docket No. C-4365 (FTC July 27, 2012) available at

https://www.ftc.gov/sites/default/files/documents/cases/2012/08/120810FBdo.pdf. See

also FB, *Analysis of Proposed Consent Order to Aid Public Comment, FTC*, Dec. 5, 2011

34

and Irina Ivanova, *FB's Past Failures, MSN Money*, Mar. 22, 2018 University of Cambridge Psychometrics Center. See also Complaint at *Fraley v. FB, Inc.*, Case No. 11-CV-196193, Cal. Super. Ct. Mar. 11, 2011.

160.     On August 2011, FB user' Max Schrems, a German privacy rights lawyer, filed a Complaint against FB Ireland (FB's Irish subsidiary and the location of its European headquarters) with the Irish-based Office of the Data Protection Commissioner ("ODPC") concerning the access and use of FB user's information by developers of third party applications which constituted a tremendous threat to FB user' information. Schrems alleged that FB Ireland had no way "to ensure compliance with the limited contractual measures" it imposed on developers. While FB purportedly requires third party applications to have a privacy policy, not all third party applications have one. When a FB user connects to an application that does not have a privacy policy, FB hides the link to the privacy policy, instead of warning the FB user that there is no privacy policy.

161.     As a result of Schrem's Complaint, the ODPC investigated and issued a "*Report of Re-Audit*" on September 21, 2012, which noted that FB Ireland had failed to adopt complete protection of FB user' information.

162.     Specifically, the ODPC recommended to FB Ireland that: FB users must be informed to make a fully informed decision when granting unfettered access to third party applications; it must be made easier for FB users to understand that their activation and use of an application will be visible to their FB "Friends" as a default setting; it

35

should be made easier for FB users to make informed choices about what applications installed by "Friends" can access information about them. See *Amended Settlement Agreement and Release, Fraley v. FB, Inc.*, (Oct. 5, 2012) available at https://www.scribd.com/document/120980082/Fraley-v-FB-Amended- Settlement-Agreement-2012-10-05.

163.    This compromise of FB  user' information also revealed that FB had been merging user's information with information submitted by their contacts in order to create fuller profiles of its users. Essentially, information of non- FB users whose information may have been uploaded by "Friends" of FB users was being collected by FB and was also exposed to third parties.

164.    On December 30, 2013, FB users filed a lawsuit against FB for scanning the content of their messages without consent for use in honing its advertisements in violation of the Electronic Communications Privacy Act and California's Invasion of Privacy Act.

165.    A non-monetary settlement agreement was reached in April 2017 in which FB enacted a number of changes to its ability to monitor and use its user's communications for advertisement purposes as well as changes to its help center and overarching Data Policies. See FB Ireland Ltd., *Report of Re-Audit, Data Protection Commissioner*, Sept. 21, 2012.and Irina Ivanova, *FB's past failures, MSN Money,* Mar. 22, 2018.

166.    On September 11, 2017, the Spanish Agency for Data Protection ("AEPD") announced that it had fined FB €1.2 million for violating information protection

36

regulations following its investigation to determine whether the processing carried out by FB complied with the information protection regulations.

167.    The AEPD stated that its investigation verified that FB failed to inform users in a comprehensive and clear way about the information that it collects or about how such information is subsequently treated. in particular, the AEPD found that FB collects information derived from its user's communications with third party sites without informing them that FB collects such information or for what purposes it will later be used or disseminated.

168.    The AEPD also found that FB's "Privacy Policy" contains generic and ambiguous language and requires clicking through a multitude of different links to view it in full. Further, the AEPD concluded that FB makes an inaccurate reference to the way it uses the information it collects, so even FB users with an average knowledge of new technologies would not become aware of FB's information collection, storage, aggregation or use policies.

169.    In May 2017, the French information protection authority fined FB its maximum allowable fine of €150,000 for violations similar to those claimed by the Spanish authorities. The Commission *Nationale de 'Informatique et des Libertés* complained that FB "…proceeded to a massive compilation of personal user information of Internet users in order to display targeted advertising" and "it has also been noticed that FB collected information on the browsing activity of Internet users on third party websites without their knowledge." See Transcript of Zuckerberg's U.S. Senate hearing. See also the

*Washington Post*, Apr. 10, 2018 and Matthew Rosenberg, Nicholas Confessore, and
Carole Cadwalladr, *How the Trump Consultants Exploited the FB Data of Millions, the
New York Times*, Mar. 17, 2018; and Parmy Olson, *Face-To-Face with Cambridge
Analytica's Elusive Alexander Nix, Forbes* magazine, Mar.20, 2018; and David Meyer,
*Here's Why FB Got a $1.4 Million Privacy Fine in Spain, Fortune,* September 11, 2017.

170.     Six4Three the developer of a computer application called Pikinis, filed a lawsuit
against FB, further undermining FB's repeated assertion that it has always prioritized its
user's privacy. Pikinis was shut down approximately four years ago after FB blocked its
third party unfettered access to a back-door channel to FB's user's "Friends" FB
information.

171.     In their lawsuit, Six4Three claimed that FB engaged in "an anti-competitive bait-
and-switch scheme" that duped Six4Three, and thousands of other application developers
into making hefty investments to build applications, only to later decide it would be in
FB's best interest to no longer allow so many application developers unfettered access to
its user's information and proceeded to block such access.

172.     While FB has denied any wrongdoing in the Six4Three lawsuit, its blocking
access action confirms that FB has always had the ability to change its access practices
with respect to application developers, device manufacturers and others third parties
accessing FB  user's information, instead opting not to when it opted to aid and abet the
Trump Campaign, Robert Mercer, Cambridge Analytica Russian operatives and others to
sabotage the 2016 U.S presidential elections.

173.    In 2014, even after FB changed certain of its third party access policies to FB's users' information, FB took a full year before ending third party application developer access, far more than enough time for application developers to plunder every FB user's information.

174.    FB also failed to follow up on suspicious activity when security protocols were triggered, as noted by whistleblower Christopher Wylie. See Alex Hern and Jim Waterson, FB in public relations crisis mode over Cambridge Analytica scandal in the *Guardian*, Apr. 24, 2018.

175.    FB's failure to detect and prevent the plunders of its user's information by Cambridge Analytica and other third parties or to adequately respond with proper notification and disclosures to FB users in accordance with best practices and applicable laws, belies any claim that FB's monitoring practices and internal information security and privacy policies were in any way sufficient.

176.    Clearly, FB's user privacy protection policies, practices and procedures were willfully woefully inadequate because FB knew of the inadequacies since at least 2010 and did little of consequence to correct them.

177.    FB violated the privacy of-hundreds-millions of American citizens, including Zimmerman's, and the negative impact of FB's failure to protect its user's privacy and FB's willful spread of Russian anti-American political propaganda for profit unless corrected is likely to continue far into the future and thus compound the suffering and damage FB has already inflicted on Plaintiffs and countless others.

39

178.    A second FTC investigation of FB centers on whether FB violated a 2012 Consent Decree with that agency that required, among many other things, FB to receive explicit permission from users before it shared their personal information. FB gave broad unfettered access to its user's information to at least 60 companies with which it had information-sharing agreements.

179.    Prosecutors from the U.S. attorney's office for the Eastern District of New York have been conducting a criminal investigation of FB, with a grand jury subpoenaing records from at least two smartphone manufacturers that had partnered with FB and who FB had allowed to access personal information from hundreds of millions of FB users.

180.    The U.S. Department of Housing and Urban Development ("HUD") filed a civil complaint against FB, charging FB with discrimination in its advertising practices for housing. HUD is seeking damages for anyone harmed by FB's targeted advertising policies. A senior HUD official told CNBC it expects that millions of users may have been affected by the allegedly discriminatory policies based on the scale of FB's platform.

181.    FB has since changed its advertising system to no longer allow employers and landlords to limit their targeted audience by race, ethnicity or gender and it recently settled a lawsuit over the practice.

182.    The European Union's information protection watchdog group has launched multiple investigations into FB's privacy practices.

183.    Ireland's Data Protection Commission released a report that disclosed fifteen ongoing investigations of major tech firms as of the end of 2018.

40

184.     Of those investigations, 10 were focused on the way FB's user' information is used by FB and included FB-owned Instagram and WhatsApp. The investigations largely centered around whether FB or its subsidiaries violated the European Union's General Data Protection Regulation ("GDPR").

185.     FB was scheduled to appear in front of an appeals court in Brussels for a two-day hearing to challenge a 2018 court order, which said it must stop tracking users and non-users without their consent. In a press release published prior to the hearing, the Data Protection Authority said that it stands by the court's initial ruling and believes "that FB should be ordered to respect Belgian and European privacy rules when it processes personal information through its cookies, social plug-ins and pixels."

186.     FB has appealed a ruling from Germany's Federal Cartel Office that called into question FB's business model and said it "overstepped" the boundaries of GDPR, especially in light of what it called "FB's dominant position" in the market. "There is no effective consent to the [FB] user's information being collected if their consent is a prerequisite for using the FB.com service in the first place," the case summary stated.

187.     FB defied a summons and did not attend a hearing at the Canadian Parliament. Lawmakers from 10 countries, including the U.K. and Australia, are scheduled to attend the meeting. "Collectively we represent about 450 million people, it's a bigger population group than the U.S.," Bob Zimmer, the chairman of the Canadian parliamentary committee hosting the international meeting, told CNN.

41

188.     Zimmer said he wanted to hear from FB's top two executives [Zuckerberg and Sandberg] who had opted out, not their replacements. "Knowing the structure of FB and how it is micro-managed right from the top, any change on the platform is done through Mr. Zuckerberg or through Ms. Sandberg."

189.     "It's not that hard to jump on a plane and make some time to hear from legislators and answer their questions," Zimmer told CNN. Zimmer added that the decision to hold the two in contempt would be voted on by the whole of Parliament. "Nobody is going to come with some handcuffs and arrest them, but to be held in contempt by an entire country would not serve any platform well," he added.

## VI.  FB' CONSPIRATORIAL CONDUCT AND ADMISSIONS REGARDING THEIR ROLE IN THE SABOTAGE OF THE 2016 U.S. PRESIDENTIAL ELECTION CYCLE

190.     Plaintiffs repeat and re-allege all preceding and following paragraphs as if fully set forth herein.

191.     Zuckerberg has admitted over and over again that FB user's information was repeatedly plundered by third parties and others.

192.     But these admissions came only after the FB user' information plunders and other FB election compromises were reported in the media and led to the public outrage that induced several congressional inquiries into FB's involvement in the sabotage of the 2016 U.S. presidential elections and other unlawful conduct.

42

193.     Zuckerberg paved the way for the sabotage of the 2016 U.S. presidential elections when on October 1, 2012 Z he met with Russian Prime Minister Dmitry Medvedev in Moscow and can be seen in a photo with the Russian Prime Minister glad-handing and smiling profusely as he hands Medvedev a T-shirt inscribed on the front www.FB.com/DmitryMedvedev. It's possible Zuckerberg was compromised before he dropped out of college or shortly thereafter.

194.     Zuckerberg who willingly travelled to Moscow, declined to travel to England to answer charges being contemplated against FB being brought by the British government. Surely the Medvedev meeting involved more than a T-shirt.

195.     Zuckerberg willfully lied over and over again when he publicly declared that "The security of [FB users] privacy allows FB users to freely engage and share their  feel free to connect because they know that their privacy is going to be protected." See, https://www.cnbc.com/2018/04/03/zuckerberg-on-FB-and-privacy-before-cambridge-analytica-scandal.html.

196.     However, long before and contrary to Zuckerberg's self-serving public pronouncements regarding FB user' contentedness with FB user' information privacy protections, FB launched a multifaceted strategy that willfully, recklessly and dangerously violated its user's right to privacy.

197.     Never before has any U.S. company exploited its customer's stored information for profit and market power or actively engaged in the cyber-sabotage of U.S. elections as did FB. See *Trump Consultants Exploited the FB Information of Millions, New York Times*

43

(Mar. 17, 2018) See also, Carole Cadwalladr, '*I Made Steve Bannon's Psychological Warfare Tool': Meet the Information War Whistleblower*, the *Guardian* (Mar. 18, 2018).

198.    In the wake of the media's public disclosure of FB's willful FB user privacy protection deceptions, Zuckerberg admitted: "[I]t's clear now that we didn't do enough. We didn't focus enough on preventing abuse and thinking through how people could use these tools to do harm as well. That goes for fake news, foreign interference in elections, hate speech, in addition to developers and information privacy. We didn't take a broad enough view of what our responsibility is, and that was a huge mistake. It was my mistake."

199.    Zuckerberg's admission that FB's role in the sabotage or the 2016 U.S. presidential elections was "my mistake" is an outrageous euphemism.

200.    There was no mere Zuckerberg "mistake."

201.    Instead and conversely, FB aggressively sought the advertising dollars of anti-democratic advertisers and hate mongers, including those of Russian operatives, the Trump Campaign, Robert Mercer and numerous others and they were well aware that its FB user's information was not only plunderable but also, at their direction and consent, had been made widely available by FB to an assortment of third parties, certain of which sought to undermine America's democratic institutions, free and fair elections, constitutional protections, free and fair markets and much, much more.

202.    Before, during and after the President assumed the Office of the Presidency, the Trump Campaign conspired with and paid FB millions of dollars to spread lies, disinformation and misinformation to influence FB users and others to vote for Trump, to

44

promote white supremacy, to coverup Russia's role in the sabotage of the 2016 U.S. presidential elections, to divide America's electorate, to disparage Trump's political opponents, to denounce the judiciary and humiliate persons opposed to the Trump candidacy and to demean and cheapen the institutional pillars of America's democracy.

203.     While Zuckerberg has commented that FB was as surprised as anyone by the mammoth 2014 FB user' information plunder, in fact FB actually encouraged the plundering by allowing numerous third parties unfettered access to its user information repositories and its willfully lax approach to protecting the privacy of its user's information.

204.     A 2011 FTC Complaint specifically references FB allowing third party unfettered access to FB user' information and convinced FB to sign a multi-count "Consent Decree" to correct its deceptive privacy protection , which FB has, for the most part, willfully and recklessly ignored.

205.     During his testimony before the Senate Commerce and Judiciary Committees on April 10, 2018 and testimony before the House Energy and Commerce Committee on April 11, 2018, Zuckerberg admitted that "[FB] didn't take a broad enough view of [its] responsibility [on information privacy] stating: "It was my mistake. And I'm sorry.  I started FB, I run it, and I'm responsible for what happens here."

206.     Zuckerberg committed to improve his company's security, including the basic responsibility of protecting the privacy of FB  user' information, which he entirely and willfully failed to do.

207.     In 2018, Senator Amy Klobuchar (D-Minn.) made it clear to Zuckerberg that Congress disapproves of FB's current privacy efforts. She stated: "I think we all agree that what happened here was bad. You acknowledged it was a breach of trust. And the way I explain it to my constituents is that if someone breaks into my apartment with the crowbar and they take my stuff, it's just like if the manager gave them the keys or if they didn't have any locks on the doors, it's still a breach; it's still a break in." Todd Shields and Vonnie Quinn, *FB Could Be Fined Millions for Violating Consent Deal, Bloomberg News.* Mar. 29, 2018.

208.     Similarly, Senator Catherine Cortez Masto questioned Zuckerberg on FB's privacy policies and on whether FB had violated the 2012 FTC "Consent Decree."

209.     There are eight counts of deceptive acts and practices in the November 2012 FTC "Consent Decree" that bar FB from, among other things, any further deceptive privacy claims.

210.     And, most importantly, the FTC "Consent Decree" required FB to give its users clear and conspicuous notice and to obtain affirmative express consent before sharing their information with third parties.

211.     Senator Cortez asked Zuckerberg, "That was part of the FTC "Consent Decree," correct?"

212.     Zuckerberg answered: " Senator, that sounds right to me."

46

213.     Continuing through his testimony before the U.S. Senate, Zuckerberg also admitted that FB made a mistake in not following up with Cambridge Analytica in 2015 to ensure the FB user' information they plundered from FB was, in fact, deleted.

214.     Zuckerberg also stated that he "clearly viewed it as a mistake that we didn't inform people" about the misappropriation of their information at that time, and also did not notify the FTC in 2015, despite the 2012 "Consent Decree" to do so.

215.     Despite FB's lengthy and oft repeated privacy protection promises and a still active FTC 2012 "Consent Decree" setting forth a number of FB information security obligations, FB failed to prevent the aggregation of the information of millions of its users, thereby exposing those users to potential unauthorized use of their information in the future. See FTC press release, *"Statement by the Acting Director of FTC's Bureau of Consumer Protection Regarding Reported Concerns about FB Privacy Practices"*, Mar. 26, 2018 and transcript of Zuckerberg's U.S. Senate hearing, the *Washington Post*, Apr. 10, 2018.

216.     Making the malfeasances of FB even worse, in the days after the 2016 U.S. presidential elections, Zuckerberg dismissed as "crazy" any suggestion that disinformation, misinformation, fake political propaganda and more broadcast by Russian intelligence agents and operatives, the Trump Campaign Robert Mercer and others on FB could have swayed the elections, a position the President maintains still.

217.     Zuckerberg has since said he regrets making that and other comments, yet FB has done little to fix its lax privacy protection measures to preclude the use of FB user' information to unlawfully sway future elections, though it did block the political messages

47

of Senator Elizabeth Warren and continues to block Zimmerman from promoting his books on FB, books that express political ideas very similar to those of Senator Warren's and to use FB for any purpose whatsoever.

218.    Meanwhile Zimmerman's FB "Friends" continue to communicate with him using FB, but he is blocked from communicating with them.

219.    FB is willfully engaged in censoring political speech on a highly selective basis, lawful and non-violent political speech that is historically given the highest protection under the First Amendment to the U.S. Constitution and numerous state constitutions, including those of California and North Carolina is censored by FB, while that of Russian operatives and terrorists is not.

220.    In a self-serving but ineffectual effort to gain sympathy, while testifying before Congress Zuckerberg said even his own FB user' information was plundered.

221.    Prior to his congressional testimony, Zuckerberg set up a war room at FB headquarters and spent months preparing his congressional testimony, actions hardly necessary if he was going to testify truthfully.

222.    Not once has FB disclosed to Plaintiffs or possibly any other FB user just how often and by whom Plaintiff's FB user' information and that of their FB "Friends" was accessed and/or collected and used by third parties, or how, if at all, FB would prevent and/or remedy future domestic and foreign compromises and the further spread of already compromised information of their FB user' information.

223.     What was disclosed are photos of Zuckerberg in Moscow on October 1, 2012 glad-handing and smiling profusely as he hands Russian Prime Minister Dmitry Medvedev a T-shirt.

224.     Like many another huge organization that has faced the prospect of congressional and regulatory agency investigations into its alleged unlawful activity, FB hired dozens of expensive attorneys and lobbyists to arrange to dilute and/or thwart those congressional and regulatory investigations. D.C. floats on a deep pool of cash, a commodity FB has plenty of.

225.     In an admission against interests, FB stated that those who plundered the information of FB users would not face consequences from FB.

226.     The chairman of the *New York Times* referred to Zuckerberg's views regarding the news of FB's plundered user' information as "a terrifyingly naïve perspective that makes my blood run cold and the CEO of *NewsCorp* said "We have entered into an era where the pervasiveness of FB makes Standard Oil look like a corner gas station" and the editor-in-chief of *Wired* magazine said: "News publishers have been reduced to sharecroppers on FB's massive industrial farm."

227.     Congressman David Cicilline stated: "No question that we have reached a tipping point; we stand at the precipice of sacrificing the news organizations that are central to uncovering corruption, holding the government and giant corporations accountable."

228.     Zuckerberg has admitted that it was his and FB's actions and inactions that helped allow the tens-of-millions of FB user's Cambridge Analytica plundered information from

to rig the 2016 U.S. presidential elections against Secretary Clinton and in favor of the President, actions and inaction coordinated with the Trump Campaign, Russian intelligence agents and operatives, Robert Mercer and others, a form of cyberwarfare that is possibly treasonous.

229.     A New York State Attorney General joined with his Massachusetts counterpart in her investigation into FB's handling of FB user' information stating that: "Consumers have a right to know how their information is used and companies like FB have a fundamental duty to protect their user's information."

230.     There are all sorts of privacy protection obligations that FB promised to undertake and then failed to undertake under the terms of the FTC 2012 "Consent Decree" and FB faces heavy monetary fines and other penalties after a second (2018) FTC's investigation found that FB failed to address the numerous charges of misconduct set out the 2012 FTC "Consent Decree" that FB agreed to remedy.,

231.     In August 2019, the FTC fined FB $ 5 billion for its misconduct, less than one month's revenues and testament to the influence of the expensive attorneys and lobbyists FB hired to defend it against the FTC's charges.

232.     FB has been aware of the misappropriation and misuse of FB user' information since at least 2010 and yet has done little to protect that information or notify FB users whose information was sold or traded by FB or plundered by third parties, deceptive, willful and reckless FB action and inaction that constitutes numerous violations of state and federal laws dealing with compromised information.

233.    Plaintiffs and countless other FB users trusted FB because FB's tedious, non-negotiable contract states: "You own all of the "… information you post on FB, and you can control how it is shared through your privacy and application settings." This and other FB promises are willfully , intentionally deceptive, false and misleading. Quote, as above, taken from FB "Terms of Service," dated January 30, 2015. https://www.FB.com/terms.

234.    FB's "Terms of Service" includes hundreds of intentionally incomprehensible pages that are universally unread or misunderstood by FB users.

235.    Moreover, also without user consent, FB has repeatedly modified the "Terms of Service" and other sections of its contract with its users to suit only its own purposes.

236.    Between 2011 and 2012, Sandy Parakilas was the FB platform operations manager responsible for policing the use of FB  user' information by third party application developers and others.

237.    IN 2011, Parakilas provided FB senior executives with a detailed presentation outlining FB's user information vulnerabilities. Certain of his warnings follow: "My concerns were that all of the information that left FB servers to developers could not be monitored by FB, so we had no idea what developers were doing with the information," Parakilas maintained, adding that "FB had "Terms of Service" and settings that people didn't read or understand and FB did not use its enforcement mechanisms, including audits of external developers, to ensure information was not being misused."

238.    FB Defendants did nothing to address the Parakilas security warnings. See https://www.washingtonpost.com/opinions/i-worked-at-FB-i-know-how-cambridge-

analytica-could-have-happened/2018/03/20/edc7ef8a-2bc4-

11e88ad6FBc50284fce8_story.html?utm_term=.faaca3c6d7b4.

239. "It has been painful watching," Parakilas said, "...because I know that FB could have prevented it."

240. FB's failure to adequately protect its FB user' information is further documented at https://www.theguardian.com/news/2018/mar/20/FB-information-cambridge-analytica-sandy-parakilas.

241. To repeat, FB's non-negotiable contract with its users' states: "You own all of the information you post on FB, and you can control how it is shared through your privacy and application settings."

242. Yet, FB intentionally breached this and other contractual provisions as alleged herein. Thus, FB willfully, deceptively, recklessly and dangerously misled its users into believing that FB would protect the privacy of their FB user' information.

243. Explicit FB policy further prohibits "any action...that infringes or violates someone else's rights or otherwise violates the law." However, as Parakilas later revealed, FB did enforce its user information privacy protection policy.

244. By way of illustration, Parakilas described an infringement by a computer application called Klout, which was creating unauthorized profiles of children.

245. Parakilas was tasked by FB with calling a Klout executive to ask whether it was violating any FB policies because FB had no other way of verifying violations.

52

246.     The Klout executive assured Parakilas it was not violating any FB policies and FB took no further action with regard to the Klout violations.

247.     In December 2015, the *Guardian* published an article that exposed the unauthorized plunders of nearly a hundred million FB users by Cambridge Analytica on behalf of Senator Ted Cruz's 2016 presidential campaign. See  https://www.theguardian.com/us-news/2015/dec/11/senator-ted-cruz-president.-

248.     The Cambridge Analytica plunders of FB  user' information was funded and directed by Robert Mercer (a megadonor and informal advisor to the Trump Campaign) and Steve Bannon (a former Trump Campaign and Trump administration senior political strategist and advisor) to sabotage the 2016 U.S. election cycle.

249.     For reasons as yet unknown, Bannon is cited over 100 times in the Special Counsel's redacted report, while Robert Mercer and his partner in unlawful political conduct Rebecka Mercer are not so cited.

250.     Upon reviewing FB's request to delete the FB illicitly obtained user information, Cambridge Analytica' whistleblower Christopher Wylie said he was "…astonished by FB's lackluster response…All they asked me to do was tick a box on a form and post it back."   See        https://www.theguardian.com/news/2018/mar/17/information-war-whistleblower-christopher-wylie-faceook-nix-bannon-trump.

251.     On June 18, 2016, FB executive Andrew Bosworth defended FB's aggressive growth tactics, stating in a memo entitled *The Ugly* obtained by *BuzzFeed* that highlighted many of FB's questionable practices and elevated FB's quest for infinite growth above all

else, even the security, privacy and safety of its users by stating: "We connect more people. That can be bad if they make it negative. Maybe it costs a life by exposing someone to bullies. Maybe someone dies in a terrorist attack coordinated on our tools. And we still connect people. the ugly truth is that we believe in connecting people so deeply that anything that allows us to connect more people more often is de facto good. It is perhaps the only area where the metrics do tell the true story as far as we are concerned." See https://newsroom.FB.com/news/2018/03/suspending-cambridge-analytica/.

252.    Given the cult of growth at any cost instigated by FB Defendants and as documented in Bosworth's memo, FB's proposed remedial measures are grossly inadequate as corrective measures to assure the protection of FB user' information and were announced only after Cambridge Analytica's plunder of nearly a hundred million FB user's information made headlines and Congress and law enforcers began investigating FB's user' information protection failures.

253.    FB Defendants deceptive, willful and reckless actions and inactions caused Plaintiffs to suffer, among other things, the following harms:

(1) Plaintiffs have zero control over their information or how that information is used by FB and third parties.

(2) The value of Plaintiff 's FB user information has been diminished because it is no longer private and is readily available to third parties throughout the world.

(3) Plaintiff's FB user' information has been abused and misused by FB and is still vulnerable to future abuse and misuse.

54

(4) There is no way Zimmerman can secure his FB user information or protect it from future misuse and abuse because, among other reasons, FB has blocked Zimmerman from accessing his information and his FB accounts and Zimmerman has not the means to learn who has his FB user' information or how it has been or will be used.

(5) Zimmerman has had his opportunity to participate in the political process diluted by virtue of being improperly targeted with illegal propagandistic political messages in the past and in the foreseeable future.

(6) Zimmerman has lost his opportunity to use the FB platform to support the candidates of his choice among his FB user' "Friends" and others.

(7) Zimmerman was unable  follow his plan to market his books using FB because his accounts were blocked by FB.

(8) Zimmerman suffered and is still suffering monetary losses and significant emotional distress from the sabotage of the 2016 U.S. presidential elections as willfully and recklessly aided and abetted by FB.

(9) FB users and Zimmerman's FB user' "Friends" continue to communicate with him but since Zimmerman's FB accounts remain blocked, Zimmerman cannot communicate with them.

254.     Zimmerman, like many other FB users, had thousands of FB "Friends" and intended to use the FB  platform to support certain political candidates and as his primary means to market his pro-democracy political books and his novel.

55

255.    FB's willful and reckless failure to adequately prevent the illegal course of

conduct herein alleged regarding the plunder of FB user' information, including

Plaintiff's, leaves that information dangerously unprotected and open to further improper

and illegal use and abuse, such as identity theft and elections manipulation.

256.    The access to FB user' information granted by FB to third parties and plundered

from FB is extremely valuable. The names, email addresses, recovery email accounts,

telephone numbers, birthdates, passwords, security question answers, and other

information can all be used to gain unfettered access to a variety of Plaintiff's online

commercial, informational and other resources.

257.    Identity thieves use plundered information to harm their victims through

embarrassment, blackmail, or harassment in person or online, or to commit other types of

fraud including obtaining ID cards or driver's licenses, fraudulently obtaining tax returns

and refunds, and obtaining government benefits.

258.    A presidential report on identity theft from 2008 states that: "In addition to the

losses that result when identity thieves fraudulently open accounts or misuse existing

accounts,…individual victims often suffer indirect financial costs, including the costs

incurred in both civil litigation initiated by creditors and in overcoming the many

obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft,

for example, health-related or criminal record fraud, face other types of harm and

frustration."`

56

259.    In addition to out-of-pocket expenses that can reach thousands of dollars for the

victims of new account identity theft, and the emotional toll identity theft can take, some

victims have to spend what can amount to a considerable amount of time and money to

repair the damage caused by the identity thieves.

260.    For example, victims of identity theft must correct fraudulent information in their

credit reports and monitor their reports for future inaccuracies, close existing bank

accounts and open new ones, and dispute charges with individual creditors. See, the

President's Identity Theft Task Force, Combating Identity Theft: A Strategic Plan,

Federal Trade Commission, 11 (April 2007),

http://www.ftc.gov/sites/default/files/documents/reports/ combating-identity-theft-

strategic-plan/strategicplan.pdf.

261.    The problems associated with identity theft are exacerbated by the fact that many

identity thieves will wait years before attempting to use the information they have

obtained. Indeed, Zimmerman will need to remain vigilant against unauthorized

information use for the rest of the limited time he has left.

262.    Once plundered, FB user' information can be used in a number of different ways,

including  sale on the "Dark Web," a heavily encrypted part of the Internet that makes it

difficult for authorities to detect the location or owners of a website.

263.    The "Dark Web" is not indexed by Google and is only accessible using a Tor

browser (or similar tool), which aims to conceal user's identities and online activity. The

57

"Dark Web" is notorious for hosting marketplaces selling illegal items such as weapons, drugs, and plundered information.

264.     Once someone buys plundered victim information, it is then used to gain unfettered access to different areas of the victim's digital life, including bank accounts, Internet-based platforms and credit card details. During that process, other sensitive information may be harvested from the victim's accounts, as well as from those belonging to family, friends, and colleagues.

265.     In addition to the information it contains, a plundered FB account can be very valuable to cyber criminals.

266.     Since FB accounts are linked to myriad financial and non-financial accounts, a plundered FB user' account offers plunderers countless opportunities to ply their illegal and harmful pursuits. See, Brian Hamrick, *The Dark Web: A trip into the Underbelly of the Internet, WLWT News* (Feb. 9, 2017 8:51 PM), http://www.wlwt.com/article/the-dark-web-a-trip-into-the-underbelly-of-the-Internet/8698419.

267.     Adding to Plaintiff's fear that their information has been plundered by identity thieves is the fact that none of FB's alleged remedial actions included giving proper notice to Plaintiffs that their FB user' information may have been plundered.

268.     Plaintiffs had been registered FB users with thousands of FB "Friends" for several years before FB blocked their accounts and had provided FB their information as consideration for the use of the FB platform and relied on FB's contractual promises to protect their information from access and use by third parties.

58

269.    Plaintiffs have never consented to allowing FB or any third party to sell, trade or
allow unfettered access to their FB user' information for political or any other purpose.

270.    Plaintiffs believe they are among the millions of Americans whose FB user'
information was plundered by Cambridge Analytica.

271.    Zimmerman has no way to learn how many information plunderers and non-
plunderers have had unfettered access to and collected for future use Plaintiff's FB user
information.

272.    Zimmerman could not have been reasonably expected to know that FB's stored
user' information could be plundered, aggregated, targeted and then used for improper
and illegal purposes, including the sabotage of the 2016 U.S. presidential elections.

273.    The *Economist* magazine reported in 2017 that: "The world's most valuable
resource is no longer oil, but information."

274.    FB captured and stored information includes: person and company names and
addresses, hometowns; birthdates; gender; family connections; educational achievements;
email addresses; relationship statuses; work histories; personal and business interests;
hobbies, religious and political affiliations; phone numbers; dates and times of active
sessions on FB; dates and times and titles of advertisements ; connections with other FB
users and non-users; communications with other FB users, current and last locations;
attendance at events and social gatherings, stored credit card information, the people the
FB user' is "Friends" with and/or follows, FB groups the FB user' is a member of; a list
of Internet addresses where FB users have used while using their FB accounts, posts or

59

sites the FB user' has liked, searches conducted by the FB user, photographs and videos documenting all aspects of a FB user's life and the lives of his "Friends" and family; and their activity in FB-connected applications.

275. FB's information storage repositories contain multiple quintillions of FB user' and non-user' information as amassed from billions of persons and businesses throughout the world. One quintillion of information is the equivalent of all of the words ever uttered since Adam and Eve first spoke in the "Garden of Eden."

276. FB Defendants have schemed to monetize in various ways its vast store of FB user' and non-user information in conscious disregard for the contractual and constitutional rights of its users and non-users and by so doing have inflicted enormous damage on them and on Plaintiffs.

277. FB has successfully willfully misrepresented itself as an eleemosynary enterprise that enables free communication among its users, when, in fact, it was selling and trading strategically targeted unfettered access to FB stored user' information to commercial and political advertisers such as the Russian operatives and intelligence agents thirteen of which remain indicted by the Special Counsel and fugitives from justice..

278. FB's practice of selling targeted unfettered access to FB user' information was an willful FB business strategy designed and implemented by FB to increase FB revenues and market power by monetizing its user's information, a business strategy that proved wildly successful and created huge incentives for FB to ignore the 2012 FTC "Consent Decree" it had signed.

279.     Additionally, FB collects user' information from Instagram, Messenger and Whatsapp, three other media/mobile applications that FB owns and manages, making it impossible to assess how much FB user' information has been sold or traded by FB and plundered by third parties with and without FB's knowledge and/or permission.

280.     FB executives have admitted that third parties have used FB's "Friend" search function to plunder FB user' information by submitting phone numbers or email addresses they already have through FB's search and account recovery, stating: "Given the scale and sophistication of malevolent third party activity, we believe 'most people' on FB could have had their public profile scraped in this way."

281.     "Most people" on FB means that we're talking about at least hundreds-of-millions of FB users whose FB user' information has been spirited away into countless third party information repositories.

282.     A vital feature in the rapid growth in the numbers of FB users is the false sense of control FB users, including Plaintiffs, have been led by FB to believe they have over their information.

283.     FB's privacy settings purport to offer FB users control over the dissemination of various categories of their user' information, whether it be privately with particular FB users, or with all of their FB user' "Friends", or with "Friends" of FB "Friends", or with all FB users. See https://ww.cnbc.com/2018/04/04/FB-updates-its-terms-of-service-to-include-messenger-instagram.html.

61

284.     Thus, FB users reasonably expected that their information would only be accessible to the extent they authorized such access. See https://www.theatlantic.com/technology/archive/2018/04/most-people-on-FB-may-have-had-their-accounts-scraped/557285/.

285.     In reality, the information of FB users was not within the control of FB users, but instead had been plundered by Cambridge Analytica (a foreign business entity funded and directed by U.S. citizen Robert Mercer) and was used by FB, Russian intelligence agents and operatives, the Trump Campaign, Robert Mercer and others who conspired to and succeeded in sabotaging the 2016 U.S. presidential elections.

286.     FB's greed and quest for ever increasing profit and monopolistic market power enabled third parties like Cambridge Analytica to unlawfully appropriate the FB user information of nearly a 100 million FB  users, information that was later used by FB, Russian intelligence agents and operatives, the Trump Campaign, Robert Mercer and others to successfully sabotage the 2016 U.S. presidential elections.

287.     Beyond those FB' efforts to undermine the fundamental constitutional right of Zimmerman to vote in a free and fair elections, FB, Russian intelligence agents and operatives, the Trump Campaign, Robert Mercer and others sought to and did destabilized U.S. democratic institutions and the rule of law.

288.     Zuckerberg has publicly admitted more than once that people share information on FB because "…they know their privacy is going to be protected. the security of privacy allows FB users to freely engage and share their  feel free to connect because

62

they know that their privacy is going to be protected." See

https://www.cnbc.com/2018/04/03/zuckerberg-on-FB-and-privacy-before-cambridge-

analytica-scandal.html.

289.    In the weeks leading up to the 2016 U.S. presidential election cycle, Roger

McNamee, one of FB's most influential investors, sounded the alarm about the FB user'

information being accessed by and used by numerous authorized and unauthorized third

parties.

290.    FB ignored McNamee's concerns and it was not until other brave whistleblowers

came forward that FB finally acknowledged the Cambridge Analytica plunders of FB

user' information.

291.    Willfully ignoring the 2012 "Consent Decree" it had signed with the FTC, FB did

not provide any notice to its users, including Plaintiffs, of the user' information breaches,

making injunctive relief particularly urgent.

292.    FB has not only failed to provide any notice of the FB  user' information breaches

to its FB users, but instead has, until recently, much like the President's oft repeated

denial that there were Russian intrusions in the 2016 U.S. presidential election cycle,

steadfastly denied there were breaches of its users' information.

293.    The FB  user' information breaches are far more egregious than the notorious

Equifax information breach because Equifax disseminated notice to its customers of the

information breach and provided a way to verify whether a particular consumer's

information was plundered.

63

294.     Instead, FB willfully suppressed information about the information breaches until investigative reporters brought it to public attention, and even then FB did nothing much to further inform its users that their information had been plundered or what FB or FB users could do to protect themselves or how their plundered information could be used to damage them. See https://economictimes.indiatimes.com/tech/Internet/information-breach-claims-false-FB/articleshow/63353256.cms.

295.     This action seeks to hold FB accountable for, among other things, their roles in facilitating the sabotage of the 2016 U.S. presidential elections, for blocking Plaintiff's FB accounts while allowing unfettered access to now indicted Russian intelligence agents and operatives, the Trump Campaign, Cambridge Analytica, Robert Mercer and numerous unnamed others to use FB to successfully sabotage the 2016 U.S. presidential election cycle, for subjecting Plaintiffs to future identity theft and other nefarious activities and for falsely inducing Plaintiffs to use the FB platform by contractually promising to protect Plaintiff's FB user information.

296.     FB obtains the lion's share of its revenue from advertisers.

297.     FB's 2017 corporate financial statement lists one of the major risks to its business as a "…decrease in user engagement, including time spent on our products."

298.     Another FB-stated major risk to FB's business is the potential decline in "the effectiveness of our strategic ad targeting and the degree to which users opt out of certain types of ad targeting, including as a result of changes that enhance the user's privacy."

64

299.     With regard to FB's strategic ad targeting, FB is now legally bound to stop advertisers from discriminating against people because of their race and other factors.

300.     FB is now legally bound to never again allow those advertising on FB to discriminate against Americans on the basis of race, national origin, religion, sexual orientation and other protected categories, a widespread FB advertiser practice that the State of Washington deemed "unlawful discrimination."

301.     The FB settlement with Washington State resulted from a two-year probe. Because it is legally enforceable, the settlement holds FB to a higher standard than previous commitments, which previously had been voluntary and ignored by FB. It also expands the types of ads that will receive more enforcement from FB to include insurance and "public accommodations", two categories FB had never explicitly said were covered under its anti-discrimination efforts.

302.     The Washington State probe stemmed from reports in *ProPublica*, beginning in 2016, that found advertisers, using FB's strategic micro-targeting tools, could conceal housing ads from African American users and other minorities. Investigators in the Attorney General's office said that they tested the system by creating "20 fake ads" on FB as part of their investigation in November and December 2017, touching everything from nightclubs to employment opportunities, that "excluded one or more ethnic minorities."

303.     After *ProPublica's* investigation, FB said it would no longer let advertisers strategically target ads for housing, credit offers and employment by "ethnic affinities," a

category that the social network had created to enable businesses to reach minority groups.

304. Even after the FB's voluntary pledge, reports revealed that FB advertisers who posted housing ads were still able to exclude people on the basis of race, calling into question FB's promise of stepped-up enforcement. FB's ad system also automatically approved housing ads that excluded mothers of high school kids, Jewish people and Spanish speakers.

305. As a presidential candidate and then as President, Trump has lied to the American people well over 10,000 times, including repeated denials of the Russian government's participation in the sabotage of the 2016 U.S. presidential elections, contravening the U.S. National Security Intelligence Community and the Special Counsel's report that has made it clear that Russian covert operations made use of FB and other Internet-based platforms in a successful effort to sabotage the 2016 U.S. presidential elections.

306. Russian trolls amassed hundreds of thousands, possibly millions, of American followers on FB, targeted them during the 2016 U.S. presidential elections with a multi-faceted campaign of anti-democratic political propaganda and pro-Trump anti-Clinton advertisement, paid for it part with Russian rubles, while FB sat back observing the online sabotage, profiting from it and actively participating in the sabotage by assigning FB employees to the Trump Campaign's San Antonio 100-person information processing facility, where the Cambridge Analytica-created voter profiles of millions of American FB users were used to help in the sabotage the 2016 U.S. presidential elections.

66

307.     Plaintiff Zimmerman is an American citizen and veteran who voted in the 2016 U.S. presidential elections (primary and general) with the reasonable expectation that the elections would be free and fair and not sabotaged by FB, Russian intelligence agents and operatives, the Trump Campaign, Robert Mercer, Cambridge Analytica and others, and that the privacy of his FB user' information and that of his FB "Friends" would be protected by FB and not used to help sabotage the 2016 U.S. presidential elections.

308.     President Abraham Lincoln once said: "I see in the near future a crisis approaching that unnerves me and causes me to tremble for the safety of my country…corporations have been enthroned, an era of corruption in high places will follow, and the money-power of the country will endeavor to prolong its reign by working up the prejudices of the people until the wealth is aggregated in a few hands and the republic is destroyed."

309.     These omniscient thoughts of President Lincoln are borrowed from a book of poetry entitled *Patriotic Poems of Freedom,* written by Natasha H. in 2001, when she was ten years old.

310.     Corrupt foreign and domestic business entities, billionaires, political organizations and individuals such as Robert Mercer, Mark Zuckerberg, Sheryl Sandberg, the Trump Campaign and the Trump Organization and their numerous unnamed co-conspirators, including Russian President Putin, Russian, Ukrainian and Balkan oligarchs and their numerous agents and operatives are metastasizing, malignant cancers eating away at the pillars of our democratic institutions.

67

Complaint                                                          Case #

311.    Bending toward transparent justice, our democracy does so by force of law as guided by our judiciary and supported by the grassroots efforts of "We the People."

312.    Every now and then Americans are confronted by pure evil in the form of terrorists like Hitler, Stalin, bin-Laden and now a new form of evil, cyber-terrorists.

313.    During the last week of August 2017, U.S. Secretary of Defense James "Mad Dog" Mattis and U.S. Secretary of State Rex Tillerson condemned the President's anti-democratic values and actions, stating in effect that the President speaks for himself and not for them, and not necessarily in America's best interests, stopping just short of calling the President's words and actions those of a home-grown terrorist.

314.    The President countered calling his self-appointed Secretary of State Rex Tillerson "dumb as a rock."

315.    General Mattis, described the President's understating of the world as that of "a fifth or sixth grader."

316.    At a White House meeting, the President's former Chief of Staff, four-star General John Kelly, said of the President: "He's an idiot. It's pointless to try to convince him of anything. He's gone off the rails, we're in Crazytown. I don't even know why any of us are here. This is the worst job I've ever had.

317.    And the President's former personal lawyer John Dowd described the President as "a fucking liar," telling the President he would end up in an "orange jump suit" if he gave oral testimony to the Special Counsel's investigation into Russian interference in the 2016 U.S. presidential elections.

68

318.    In one numerous obstructions of justice, the President refused to give oral testimony to the Special Counsel and declined to answer a preponderance of written question proffered by the Special Counsel.

319.    In addition to influencing our elections, invading our privacy, censoring our free speech, actively working to defile our democratic institutions and ruining competitors with its monopolistic practices and efforts to control consumer behavior, now FB wants to introduce its own currency.

320.    Following U.S. banking giant J.P Morgan Chase's launch of cryptocurrency JPMCoin, FB is planning to launch its own cryptocurrency in early 2020, allowing its users to make digital payments in dozens of countries.

321.    In 2018, FB asked U.S. banks to share detailed financial information about their customers.

322.    The FB created cryptocurrency, named GlobalCoin, would enable FB's billions of users to change dollars and other international currencies into its digital coins. The coins could then be used to buy things on the Internet and in shops and other outlets, or to transfer money without needing a bank account.

323.    According to the BBC, Zuckerberg met the governor of the Bank of England, Mark Carney, to discuss its cryptocurrency plans.

324.    Zuckerberg has also discussed the cryptocurrency proposal, known as Project Libra, with U.S. Treasury officials and is in talks with money transfer firms, including Western Union.

325.     Zuckerberg told the FB's developer conference: "I believe it should be as easy to send money to someone as it is to send a photo."

326.     In order to try to stabilize the digital currency the company is looking to peg its value to a basket of established currencies, including the U.S. dollar, the euro and the Japanese yen.

327.     FB is also looking at paying its users fractions of a coin for activities such as viewing FB ads and interacting with FB content related to online shopping.

328.     However, experts believe that regulatory issues and FB's poor track record on data privacy and protection are likely to prove to be the biggest hurdles to making FB's cryptocurrency a success.

329.     "FB is not regulated in the same way as banks are, and the cryptocurrency industry is, [for the most part,] unregulated," said Rebecca Harding, chief executive of banking trade data analytics firm Coriolis Technologies.

330.     The U.S. Senate Banking Committee wrote an open letter to Zuckerberg asking how the currency would work, what consumer protection would be offered and how information would be secured.

331.     It emerged recently that FB is looking for funding to support the project and has held talks with payments giants including Visa and Mastercard.

332.     FB has been long expected to make a move in financial services, having hired the former PayPal president David Marcus to run its messaging application in 2014.

70

333.     Marcus, a board member of crypto exchange Coinbase, runs FB's blockchain initiatives, the technology on which cryptocurrencies run.

334.     FB's staff has already had unfettered access to hundreds of millions of FB user' passwords and used them for nefarious purposes.

335.     FB has admitted that it has not properly masked the passwords of hundreds of millions of its users but had stored them as plain text in an internal database that could be accessed unencrypted by its staff.

336.     The fact that WhatsApp is owned by FB gives experts pause. Though there are as yet no known major breaches of WhatsApp information since FB bought the application in 2014, unlike some other encrypted messaging applications, including Signal, WhatsApp stores the call times, location and other meta-information of its user's chats, which means they're held by FB.

337.     WhatsApp co-founder Brian Acton, who sold WhatsApp to FB, suggested everyone should delete their FB accounts because of FB's many privacy scandals.

338.     Left unchecked, FB will play a major role in continuing to spread the sort of propagandistic disinformation, misinformation and propagandistic messaging and advertising that breeds anti-democratic activity in the U.S. and an exponential increase in violence as groups with opposing political views are thrown a steady diet of hate messages broadcast on the FB platform.

339.     Now facing numerous regulatory and prosecutorial investigations as well as numerous public and private lawsuits as a result of violating its user's privacy and free

71

speech rights and its monopolistic practices, FB's recent SEC filing provides an interesting look at just how serious FB is treating the recent round of federal and state lawsuits as so significant they have disclosed them in the company's quarterly SEC report.

340.     In a section of a FB SEC filing entitled "Legal Proceedings," FB states: "Beginning on March 20, 2018, multiple putative class actions and derivative actions were filed in state and federal courts in the U.S. and elsewhere against us and certain of our directors and officers alleging violations of securities laws, breach of fiduciary duties, and other causes of action in connection with the misuse of certain data by a developer that shared such data with third parties [...] the events surrounding this misuse of data became the subject of U.S. Federal Trade Commission and other government inquiries in the U.S., Europe, and other jurisdictions. Any such inquiries could subject us to substantial fines and costs, divert resources and the attention of management from our business, or adversely affect our business."

341.     However, willfully omitted from that FB statement are: FB's corrupt for-profit role in aiding and abetting Putin-led Russian operatives, the Trump Campaign, Cambridge Analytica, Robert Mercer and others in the malicious cyber-sabotage of the 2016 U.S. presidential elections; that prosecution for such aiding and abetting could lead to FB's shutdown and/or huge penalties and the prospect of imprisonment of the major U.S.-based FB executives involved of the 2016 malicious cyber-sabotage operations.

72

342.     Using the technical and financial resources of FB, Cambridge Analytica, Robert

Mercer, the Trump Campaign and others unlawfully obtained Plaintiff's FB user'

information and that of their FB "Friends" from FB's information repositories and used it

to strategically target propagandistic messaging, misinformation, disinformation, lies and

other fabrications over the FB platform to boost Trump's candidacy and in so doing

directly, recklessly and unlawfully helped sabotage of the 2016 U.S. presidential

elections.

343.     Proof that Americans who voted for Trump encountered propagandistic

messaging far more often than the general voting population follows.

344.     When Trump supporters were asked if the future 2020 presidential election should

be postponed until the country can make sure that only eligible American citizens can

vote, would you support or oppose postponing the election? (1) A majority of the 650-

Trump-supporting Republicans surveyed said yes; (2) close to half thought the President

had won the popular vote, which he lost by millions of votes; (3) more than two-thirds

believed that millions of illegal immigrants had voted, which never happened; and (4)

that voter fraud happens regularly, when in fact voter fraud is extremely rare, but election

rigging by Russians to favor Trump is not. See *Messing with the Enemy, Surviving in a*

*Social Media World of Hackers, Terrorists, Russians and Fake News* by Clint Watts.

345.     FB clawed its way to monopoly market power by fraudulently inducing billions of

people, including Plaintiffs, to use the FB platform, never realizing that FB's offer of that

purportedly free service was not free because FB fraudulently intended to sell, trade and

73

otherwise make available to third parties Plaintiff's FB user' information and that of

their FB "Friends," and that FB's contractual promises to protect Plaintiff's information

nothing but an outrageous and continuing lie.

346.     Ultimately, Plaintiff's plundered FB user' information and that of Plaintiff's FB

"Friends" would be used by FB, the Trump Campaign, Robert Mercer, Russian

intelligence agents and operatives and others to sabotage the 2016 U.S. presidential

elections and is now being used to rig the 2020 presidential elections.

347.     Plaintiff had intended to use the FB platform for personal political

communications and to promote the sale of his political and non-political books.

348.     But, FB blocked Plaintiff's unfettered access to his FB personal and business

accounts, making it impossible for Zimmerman to delete his information from FB's

computer files, or to know how his information was being used by third parties, or to

market his books especially *Fair Warning, The American Challenge, Common Sense* and

political ideas using the FB platform or to respond to thousands of messages from his FB

"friends."

349.     Plaintiff Zimmerman alleges his FB accounts were blocked because his non-

violent progressive political views ran counter to those of FB,, who later showed their

anti-democratic political ideology when they, along with the Trump Campaign, Robert

Mercer, Russian intelligence agents and operatives and others sabotaged the 2016 U.S.

political elections in favor of candidate Trump.

350.     FB was paid in part in rubles by Russian operatives and allowed those operatives

to broadcast hundreds of millions of propagandistic messages, mostly disinformation,

misinformation, lies and other fabrications that aggressively promoted the sale of anti-

democratic books and hate messaging to hundreds of millions of unsuspecting

prospective American voters.

351.     It is unlikely that Plaintiffs will ever learn just how many third parties have

collected and have used their FB user' information, or will use it in the future, or why FB

shut Plaintiffs' accounts down while encouraging the unlawful propagandistic messaging

of Russian intelligence agents and operatives, Robert Mercer, the Trump Campaign and

others.

352.     On or about May 21, 2018, FB began running ads on U.S. national television, and

possibly elsewhere, promising to take steps to protect the privacy of its user's FB

information.

353.     However, to date, these FB promises, like many other of FB's prior promises,

were empty promises as FB has not taken any substantive steps to preclude Robert

Mercer or the Trump Campaign or Russian operatives or others from the future sabotage

of U.S. elections using the FB platform or from using already misappropriated FB user'

information for whatever future purposes they wish.

354.     Two Russian cyberwarfare operatives described the effects of their cyberwarfare

activities stating: "The mass media today can stir up chaos and wreak havoc and

75

confusion in government and military management of any country and instill ideas of

violence, treachery, and immorality, and demoralize the public.

355.     Put through this propagandistic onslaught, the U.S. armed forces and the public

generally will not be ready with active defenses." See pp 136-137 in the *Plot to Destroy*

*Democracy* by Malcomb Nance.

356.     Putin-led Russian intelligence agents and operatives make no distinction between

war and peace as they upped their cyberwarfare activities during the 2016 U.S.

presidential cycle and aggressively undertook and continue to undertake strategic

subversive tasks aimed at disorienting U.S. voters, sabotaging our elections and

destabilizing our governmental institutions and the rule of law.

357.     FB Chief Security Officer Alex Stamos testified to Congress that Russian

propaganda and Robert Mercer's far-right political ads were broadcast to approximately

150 million FB users during the 2016 U.S. presidential election cycle, most of which

were targeted at key swing states.

358.     Stamos said he repeatedly confronted FB executives over the lack of security

protecting the FB  platform and once told his FB security team that he explained to FB's

top executives that FB has "the threat profile of a Northrop Grumman or a Raytheon or

another defense contractor, but we run our corporate network like a college campus."

359.     In 2010, the U.S. Supreme Court lifted restraints on how much money wealthy

donors such as Robert Mercer may spend to influence election outcomes, and by 2014 the

Mercer Foundation had distributed $70 million in donations, mainly to extremist right-

wing hate groups, a prime example of the utter destruction of the American foundational

principle, "one person, one vote."

360. Robert Mercer, a reclusive, anti-establishment, extremist right-wing political

operative used his wealth and Cambridge Analytica to help candidate Trump win the

presidency in return for future presidential favors.

361. Mercer became co-CEO of hedge fund Renaissance Technologies LLC in

November 2009 just as the federal government began cracking down on abuses that had

contributed to the nation's worst financial crisis since the Great Depression.

362. In 2010, the IRS issued a public memorandum warning hedge funds and banks

about using "basket options." The memo said that hedge funds should pay taxes at a

capital gains rate.

363. Some hedge funds and banks stopped using "basket options," but not Mercer's

Renaissance.

364. In July 2014, Senator Carl Levin, Chairman of the Senate Investigations

Subcommittee and Senator John McCain, issued a report accusing Renaissance of a giant

tax dodge on hundreds of millions of option trades and in 2015 the IRS issued a notice to

Renaissance, stating that the world's most profitable hedge fund owed at least 6.8 billion

dollars in back taxes.

365. Since then, Mercer has mounted relentless assaults on the IRS, on President

Barack Obama, on the SEC, on the Federal Reserve Bank, on the DOJ, on moderate

77

members of Congress, on presidential candidate Hillary Clinton and on governmental

regulations and agencies that negatively-impact Mercer's energy investments.

366.      Mercer has called the Civil Rights Act of 1964 a mistake and has voiced disdain

for other federal measures to protect the rights of African Americans and other

minorities.

367.      The Mercer foundation gave nearly $11 million from 2011 to 2014 to the Media

Research Center, an advocacy group whose "sole mission," according to its website,

"...is to expose and neutralize the propaganda arm of the Left: the national news media."

368.      According to data from the Center for Responsive Politics, Mercer donated more

than $22 million to extremist right wing political candidates, while advocating the

abolition of the IRS and much of the federal government.

369.      By 2016, Mercer was the leading multi-million-dollar Republican donor to

candidate Trump, which helped give Mercer a leading voice in the politics that have

impacted all Americans and America's role as a world leader.

370.      Some of Mercer's projects sought to unseat his Republican moderates, such as

Senator John McCain, who became the target of negative ad campaigns during the 2016

U.S. primary presidential election cycle and also a target of extremely disrespectful

Trump tantrums that declared that McCain was no hero because he was captured and

draft dodger Trump said he didn't like soldiers that were captured.

371.      Meanwhile, Mercer's daughter Rebekah accumulated so much political clout she

has been credited with influencing Trump's choices of several top advisors and

appointees, including Steve Bannon, Jeff Sessions, Kellyanne Conway and General Michael Flynn, now a convicted felon.

372.     In January 2017, Rebekah Mercer attended a private meeting in which she had secret communications with Jay Clayton, who the President had appointed to chair the SEC, the agency that regulates hedge funds.

373.     The Mercers' struggle with the IRS didn't end with Trump's election and Clayton's appointment.

374.     Richard Painter, chief White House ethics adviser under President George W. Bush, said the optics surrounding the Mercers' political connections and the IRS case against Renaissance "are terrible. The guy's [Mercer] got a big case in front of the IRS," said Painter, now a University of Minnesota law professor who is also vice chairman of Citizens for Responsibility and Ethics in Washington. "He's trying to put someone in there who's going to drop the case. Is President Trump going to succumb to that or is he not? Are we going to have a commissioner of the IRS who aggressively enforces the law and takes good cases to Tax Court or (somebody who) just throws away tax cases so billionaires don't have to pay their taxes and the rest of us can pay more taxes?"

375.     On March 29, 2017, at least 30 conservative leaders, including a Heritage Foundation representative, converged on the White House for an off-the-record meeting with White House officials and pressed for a range of agendas, especially urging the firing of IRS officials not sympathetic to the tax travails of Mercer's Renaissance hedge fund.

79

376.     The meeting was organized by White House aide Paul Teller, who worked with Rebekah Mercer on Senator Cruz's failed 2016 Republican presidential primary campaign, an effort that Mercer backed with $13.5 million in donations to an independent, pro-Cruz super PAC freed of the usual contribution limits.

377.     Robert Mercer then gave millions of dollars more to the super PAC  when it began to support candidate Trump.

## VII.   SERIOUS DANGERS INHERENT IN FB'S UNREGULATEDAND UNACCOUNTABLE MONOPOLISTIC BUSINESS MODEL

378.     Plaintiffs repeat and re-allege all preceding and following paragraphs as if fully set forth herein.

379.     FB has  falsely promoted itself  to its billions of registered users and non-users as an egalitarian "social networking platform" when in fact FB is an authoritarian Internet-based online advertising platform from which FB yearly derives over $60billion in advertising and advertising related revenue.

FB uses its  monopoly market and political power to advance its self-interested objectives without concern to the harm it is causing.

380.     Recently, the FTC and FB agreed on a $5 billion fine that would settle the FTC's investigation into FB's user privacy violations and other unlawful conduct.

381.     FB reported $15 billion in revenue in a recent quarter, so the $5 billion fine would amount to a mere one month's revenue.

382.     The FTC voted 3-2 to approve the settlement this week, with three yes votes from

Republican commissioners and two no votes from Democrats, the *Wall Street Journal*

reported today.. Democrats on the commission were "pushing for tougher oversight," the

*Journal* reported.

383.     "The matter has been moved to the Justice Department's civil division, and it is

unclear how long it will take to finalize," the *Journal* reported. Justice Department

reviews are part of the FTC's procedure but typically don't change the outcome of an

FTC decision."

384.     The settlement is expected to include other government restrictions on how FB

treats user privacy.

385.     FTC officials have also discussed whether to hold Zuckerberg and Sandberg

personally accountable, including criminal charges.

386.     The FTC investigation began in March 2018 after revelations that up to 87 million

users' information was improperly shared with Cambridge Analytica, a political

consulting firm that work on the 2016 Trump Campaign. The investigation focused on

whether FB violated the terms of its 2011 settlement with the FTC, which prohibited FB

from misrepresenting the privacy or security of user information and required FB to get

consumers' express consent before making changes that override their privacy settings.

387.     Two U.S. Senators found the settlement lacking. "This reported $5 billion penalty

is barely a tap on the wrist, not even a slap," Senator Richard Blumenthal said in a

statement. "Such a financial punishment for purposeful, blatant illegality is chump

change for a company that makes tens of billions of dollars every year. Will FB be compelled to alter its present, systematic abuse of privacy? Based on the reported settlement, the answer is sadly, no."

388.     Senator Ron Wyden agreed. "Despite Republicans' promises to hold big tech accountable, the FTC appears to have failed miserably at its best opportunity to do so," Wyden said. "No level of corporate fine can replace the necessity to hold Zuckerberg personally responsible for the flagrant, repeated violations of Americans' privacy. That said, this reported fine is a mosquito bite to a corporation the size of FB."

389.     FB has willfully failed to enforce its contractual promise to Plaintiffs to protect the privacy of their FB user' information and that of their FB "Friends" by selling and trading that information to third parties and by allowing still other third parties free ,unfettered access to that information to use in any way that they see fit.

390.     Hundreds of millions of Americans use the FB platform for countless purposes including advertising their goods and services, as an adjunct or alternate to email, to view and/or promote news and to broadcast their personal opinions on every conceivable topic.

391.     FB denied Plaintiffs unfettered access to their FB accounts for no expressed legitimate reason but continued to allow their FB "Friends" and others to send them messages and continued to amass, sell, trade, supplement and aggregate their FB user' information.

392.     On June 29, 2018, FB provided written responses to seven hundred questions put to them by the U.S. House of Representatives. In providing answers to these questions, FB

identified certain of the types of information its collects, stores, supplements, aggregates, sells and trades, including:

393.        • Device attributes such as operating systems, hardware and software versions, battery level, signal strength, available storage space, browser type, application and file names and types, and plugins.

394.        • Device operation information and behaviors performed on the device, such as whether a window is foregrounded or backgrounded and mouse movements (used to distinguish humans from bots).

395.        • Unique device IDs, and other identifiers, such as from games, applications and accounts people use, and family device IDs (or other identifiers unique to FB products associated with the same device or account).

396.        • Device signals and information about nearby Wi-Fi access points, beacons, and cell towers.

397.        • Information from device settings such as unfettered access to FB user' GPS locations, cameras and photos.

398.        • Network and connection such as the name of user's mobile operator or ISP, language, time zone, mobile phone number, Internet provider address, connection speed and, in some cases, information about other devices that are nearby or on user's network, so we can do things like help people stream a video.

399.        • Cookie information stored on a FB user's device, including cookie IDs and settings.

400.     FB has willfully and unlawfully allowed unfettered access to and sold or traded to all sorts of third parties, application developers and device manufacturers unfettered access to Plaintiff's FB user' information and that of their FB "Friends" while denying Plaintiffs the ability to change or delete that information.

401.     An example of FB's failure to enforce its contractual promise to protect from access and use and sale by third parties came to light when it was discovered in the mid-2010s that FB allowed a Cambridge University researcher unfettered access to FB user' information from nearly a hundred million FB's users and their FB "Friends," one of many FB willful, reckless and unlawful failures to protect the privacy of FB user' information.

402.     In 2014, that Cambridge University researcher entered into a contract with Robert Mercer controlled Cambridge Analytica for the sale of the researcher's plundered FB user' information for approximately $$800,000.

403.     The plundered FB user' information was then repeatedly used by FB, the Trump Campaign, Russian operatives, Cambridge Analytica, Robert Mercer and others in a successful effort to sabotage the primary and general 2016 U.S. presidential elections in favor of candidate Trump.

404.     The unlawful and possibly treasonous conduct of, FB, the Trump Campaign, Russian operatives, Cambridge Analytica, Robert Mercer and others could have been thwarted had if FB had denied the Cambridge University researcher's application to FB to access and use FB-stored user' information.

Complaint                                                                                          Case #

405.    Cambridge Analytica received millions of dollars from the Trump Campaign and other 2016 U.S. presidential candidates for the use of its plundered FB user' information and the technical services of Cambridge Analytica employees who became embedded along with FB employees in Trump Campaign information processing facilities and assisted in the Trump Campaign's efforts to rig U.S. 2016 presidential elections in favor of Trump.

406.    FB also granted licenses to Blackberry and at least 52 other device manufacturers that allowed the device manufacturers to integrate their devices with FB.

407.    These integrations gave the device manufacturers through applications like Blackberry's "HUB unfettered access to unlimited quantities of FB user' information, leaving FB users with no control over how their information was accessed and then used or sold or traded.

408.    Even if FB users had denied such access, their denials were easily circumvented with the full knowledge, consent and encouragement of FB.

409.    FB's willful misrepresentations to its users and failure to inform their users, including Plaintiffs that their information was being compromised willfully and recklessly deceived Plaintiffs and caused them monetary and emotional harm.

410.    Using the plundered FB user' information of nearly a hundred million Americans, including that of the Plaintiffs, and thousands of emails plundered from the Democratic National Committee ("DNC") and the Democratic Congressional Campaign Committee ("DCCC"), FB, working in concert with Russian intelligence agents and operatives, the

Trump Campaign, Cambridge Analytic, Robert Mercer and others successfully rigged the 2016 U.S. presidential elections in favor of candidate Trump.

411.     Zimmerman is not a public official. or public figure, or a candidate for public office, or a campaign official, or a personal advisor to any political candidate and did not expect his FB user' information  or that of his FB "Friends" would become available to anyone who wanted it to use for any purpose whatsoever.

412.     To repeat, FB contractually promised Plaintiffs and billions of other registered FB users that their FB  user' information would be protected from unauthorized access and use by third parties.

413.     Approximately 60% of Americans are or have been registered FB users.

414.     FB has profited by tens of billions of dollars selling and trading FB user' information and selling ads that were strategically targeted to exploit the personality traits and other personal private information of Zimmerman and millions of other FB users.

415.     The Trump Campaign spent at least $44 million on strategically targeted FB ads from June 2016 to November 2016 and continues such targeted messaging on the FB platform in its 2020 presidential reelection campaign.

416.     Strategic ad targeting was used by Trump supporter and major donor Robert Mercer to help sabotage the 2016 U.S. presidential election cycle.

417.     Robert Mercer along with the President's former senior advisor Steve Bannon, controlled, *Breitbart News*, a publication that advances what the *New York Times* calls "'hate news" (a toxic mix of lies, white-supremacist content, and bullying that have inspired

86

attacks on Muslims and their mosques, gay people, women, African Americans and their churches, Jewish people and their synagogues and others).

418.    In 2016, employees of FB, the Trump Campaign, Cambridge Analytica and others joined Trump's senior advisor Jared Kushner in a San Antonio-based information processing facility and deployed the voter profiles of millions of Americans plundered from FB to successfully sabotage the 2016 U.S. presidential elections.

419.    Kushner has been under investigation for his undisclosed contacts with Russian ambassador Sergey Kislyak, the CEO of a U.S. sanctioned Russian bank and others.

420.    FB announced that about 25% of the ads purchased by Russian operatives from FB during the 2016 U. S. presidential elections were "geographically targeted," meaning that they played primarily in swing states.

421.    In a 2016 post-election interview, Kushner told *Forbes* magazine that he had been keenly interested in FB's microtargeting capability. "I called somebody who works for one of the technology companies that I work with, and I had them give me a tutorial on how to use FB micro-targeting," Kushner said. Adding, "We brought in Cambridge Analytica. I called some of my friends from Silicon Valley who were some of the best digital marketers in the world," Kushner said, "And I asked them how to scale this stuff . . . We basically had to build a $400 million [voter targeting] operation with 1,500 people operating in 50 states."

422.    By willfully, recklessly and for profit abdicating its contractual responsibility to protect the privacy of Plaintiff's FB user' information from unauthorized and/or unlawful

87

invasions of his privacy, FB willfully and recklessly allowed Cambridge Analytica and numerous other third parties to plunder and use for unlawful purposes vast amounts of their FB user' information without FB user' consent, including Plaintiff's.

## VIII.   FB'S USE OF ITS USERS' INFORMATION AS AN EXTREMELY VALUABLE ASSET WHEN NEGOTIATING DEALS WITH THIRD PARTIES TO GAIN UNFETTERED ACCESS TO IT

423.    Plaintiffs repeat and re-allege all preceding and following paragraphs as if fully set forth herein.

424.    According to some 4,000 pages of leaked FB documents spanning 2011 to 2015 obtained by *NBC News*, Zuckerberg supervised plans to consolidate FB's ability to out-compete competitors by treating its FB user's information as an extremely valuable asset when negotiating deals to gain unfettered access to it with third parties, while publicly proclaiming to be protecting the privacy of that very same FB user' information.

425.    The leaked documents, which include emails, webchats, presentations, spreadsheets and meeting summaries, show how FB, along with FB's board of directors and management team, found ways to tap FB's trove of FB user' information, including information about FB "Friends," relationships, photos and videos, as leverage over companies it had partnered with.

426.    In some cases, FB would reward favored FB partnered companies by giving them unfettered access to the information of its users. In other cases, it would deny user-information unfettered access to rival companies.